**BANK OF NORTH CAROLINA, N. A., Plaintiff,**

v.

**The ROCK ISLAND BANK, Defendant.**

**No. RI–CIV–76–16.**

United States District Court, C. D. Illinois.

June 4, 1979.

Robert J. Noe, Moline, Ill., for plaintiff.

Peter H. Lousberg and John Lewarne, Rock Island, Ill., Robert A. Helman, George V. Bobrinskoy, Jr. and Stanley J. Parzen, Chicago, Ill., for defendant.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

Plaintiff, Bank of North Carolina,[1] filed its complaint against The Rock Island Bank,[2] alleging that Rock Island did, on June 5, 1969, issue an irrevocable letter of credit, "or commitment," to purchase at maturity a certain promissory note of Lorraine Realty Corporation.[3] A copy of the note in the principal amount of $400,000, dated June 5, 1969, is attached as an exhibit to the complaint. The complaint further alleges that NC is a bona fide holder of the note in due course, that NC tendered the note to RI for payment, but that payment was refused by RI, and that as a result of the premises, RI is indebted to NC in the sum of $234,799.72, plus accrued interest.

On August 25, 1976, the complaint was dismissed by this court for the reason that the basic instrument which supports the complaint was a contract by a state-chartered bank to guarantee the obligation of a third party, which was void and unenforceable as against public policy of the State of

1. Formerly First National Bank of Eastern North Carolina.

2. Formerly Rock Island Bank and Trust Company.

3. The letters "NC" and "RI" are sometimes employed to denote the plaintiff and defendant, respectively, and "Lorraine" to denote Lorraine Realty.

Illinois. That decision rested upon this court's application and interpretation of *Knass v. Madison and Kedzie State Bank*, 354 Ill. 554 (1933), *appeal dismissed*, 292 U.S. 599, 54 S.Ct. 632, 78 L.Ed. 1463, and other cases interpreting the Illinois Banking Act. Ill.Rev.Stat. 1977, ch. 16½, § 101 *et seq.*

That decision was reversed on appeal. *Bank of North Carolina, N.A. v. Rock Island Bank*, 570 F.2d 202 (7th Cir. 1978). A majority of the panel of the Court of Appeals held that the instrument involved was "a letter of credit." As this court understands the Court of Appeals opinion, that court held: (1) that the instrument, although it had the effect of guaranteeing the debt of a third party, was a letter of credit within the meaning and intendment of the Illinois Commercial Code, Ill. Rev. Stat. 1977, ch. 26, art. 5; (2) that the more restrictive provisions of the Illinois Banking Act, which were enacted subsequent to the Commercial Code, Ill. Rev.Stat. 1977, ch. 16½, § 105(13), must be read as being *in pari materia* with the Commercial Code; (3) that the character of the subject instrument as a letter of credit was not destroyed by the fact that it guaranteed the debt of a third party;[4] and (4) that it could not be construed as being void and unenforceable. 570 F.2d at 205–208.

Following remand, the case was tried before the court without a jury. At the close of plaintiff's case, defendant filed a motion for judgment which was predicated upon the position that plaintiff had failed in its burden of proving that it was a holder in due course of the guaranteed note, and that therefore it could not recover as a matter of law. Ruling upon that motion was reserved.

Following availability of a transcript of the evidentiary record, each party has submitted briefs, proposed findings of fact, and proposed conclusions of law. Defendant has also renewed its motion for judgment.

### The Background Facts

Under date of June 5, 1969, William J. Kearney, the then president of RI, delivered to Lorraine Realty Corporation a letter of "irrevocable and unconditional commitment to purchase your Promissory Note * * * from its holder in due course."[5]

Subsequently, NC did advance the discounted amount of said sum, namely, $354,000, to the account of Sumner Financial Corporation, hereinafter SFC, upon a transaction structured to reflect the endorsement by SFC of a note to it, dated June 5, 1969. From that amount advanced by NC, Lorraine ultimately realized through SFC the sum of $300,000.[6]

Mr. Kearney did not have authority to issue the commitment. Neither the Loan Committee nor the Board of Directors of RI

---

**4.** RI, with reference to that opinion, states that the Court of Appeals "characterized" the instrument as a letter of credit. That decision must be recognized as the law of this case and a direct determination that the instrument is a letter of credit within the intendment of the Banking Act.

**5.** "4. The commitment letter dated June 5, 1969, which bears the letterhead and logotype of 'Rock Island Bank and Trust Company,' follows:

Lorraine Realty Corporation
748 South Mississippi Boulevard
St. Paul, Minnesota 55116
Gentlemen:
We hereby issue to Lorraine Realty Corporation, 748 South Mississippi Boulevard, St. Paul, Minnesota, our irrevocable and unconditional commitment to purchase your Promissory Note to bear a maturity date of June 5, 1971.

We will purchase said Promissory Note from its holder in due course at maturity, provided the holder of such Promissory Note shall give us at least 60 days written notice of its intent to sell to us prior to delivery date, said delivery date not not to be prior to maturity date of June 5, 1971.
We hereby agree with the drawers, endorsers, and bona fide holders that this credit will be duly honored on presentation in an amount not to exceed unpaid balance of principal and interest due upon presentation.
            Yours very truly,
            /s/ William H. Kearney
            William H. Kearney
            President
Attested:
/s/ B. T. Olson
B. T. Olson, Cashier"

**6.** The mechanics of the transaction as reflected in the evidence are summarized hereinafter.

were consulted or advised in the premises. The commitment was not reflected on RI's books until in 1970, when RI authorities were contacted by examiners for the Federal Reserve System.

NC did give notice to RI of its intention to tender the note to RI for payment at its maturity on June 5, 1971. The note was duly tendered for payment through the Federal Reserve System and received by RI upon that transmittal on June 8, 1971. RI refused payment and this suit followed.

### The Motion for Judgment

Allocation of the burden of proof upon the question of holder in due course is a critical issue which must be resolved at the outset.

RI takes the position that this is a suit upon the contract created by the letter of credit, and that the obligation to purchase the note is limited to purchase from a person who is a holder in due course. It argues that NC had the burden in its case in chief of proving its "holder-in-due-course" status to prove a prima facie right to recover. Its motion for judgment at the close of plaintiff's case was predicated upon that asserted premise.

Conversely, NC relies upon the Commercial Code, and contends that it is presumptively a holder in due course until and unless it appears that there is a defense against the note. Ill. Rev. Stat. 1977, ch. 26, § 3–307(3).

Historically, the concept of a holder in due course derives from common law decisions in the area of what was termed the law merchant. The concept was devised to accord credibility to commercial paper. Basically, the principle devolved was that any defense not patent upon the face of a particular negotiable instrument could not be asserted against a bona fide purchaser of the instrument for value in good faith and without notice of such defense or infirmity.

As subsequently codified by legislative enactment, extending through the current Uniform Commercial Code, that same concept was embodied as the holder in due course principle. A holder in due course is a party who takes an instrument for value in good faith and without notice of any defense against the instrument. Ill.Rev. Stat.1977, ch. 26, § 3–302(1).

Concomitantly, with that substantive concept designed to protect the free negotiability of instruments, there was developed a procedural concept that a holder of negotiable paper need only produce and substantiate the paper and adduce proof that payment was in default, to prove a prima facie right to recover. A duty upon his part to prove his status as a bona fide purchaser, for value and without notice, could arise only upon the assertion of a defense to the negotiable instrument involved. That procedural concept is now codified in the Commercial Code, Ill. Rev. Stat. 1977, ch. 26, § 3–307(2), (3).

■ Patently, Section 3–307 applies only to a suit upon the instrument itself. It is codified in Part 3 of the Code, which defines and establishes the rights of holders of negotiable instruments.[7] Section 3–307 cannot be divorced from that context of its legislative placement. In a suit upon a negotiable instrument itself, the Section presumes a right to recovery, upon proof of the instrument, until and unless it is shown that a defense does exist. Section 3–307(2), (3).

---

7. That conclusion is impelled by a summary of Part 3. Section 3–301 establishes the right of a holder to negotiate, discharge or enforce payment of an instrument. 3–302 defines a holder in due course of an instrument. 3–303 defines the term "value," while 3–304 defines what constitutes notice to a purchaser of an instrument. 3–305 defines the rights of a holder in due course, while 3–306 defines the rights of holders not in due course.

Section 3–307 allocates the burdens of proof upon an instrument related to signatures, defenses, and due course status. It provides, in pertinent part:

"(2) When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense.

"(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course." Ill.Rev.Stat. 1977, ch. 26, § 3–307(2), (3).

Plaintiff's argument thus misconstrues its own complaint.[8] Its argument would be valid if RI were the maker of the note and if the suit were grounded upon the note itself. That is not the basis for complaint. What NC does contend is that the refusal of RI to pay the note upon presentment was a breach of the contract of RI to purchase the note if the same remained unpaid at maturity. It was thus incumbent upon NC to prove, prima facie, its own compliance with the conditions stated in the RI letter, one of which was that RI would purchase from a "holder in due course," upon compliance by such holder with the notice and tender requirements stated in the letter.

The Commercial Code has a relevant bearing upon this issue to the extent that it does provide the legal definition of a holder in due course, to-wit, a holder who takes an instrument for value, in good faith, and without notice of any defense against the instrument. Section 3–302(1). NC's proof was limited to the identification of a cancelled NC cashier's check, dated July 31, 1969, payable to SFC.

Clearly, NC did not adduce the proof necessary to show that it was a holder in due course and thus entitled to recover upon the RI letter of credit. Defendant's motion for judgment at the close of plaintiff's case in chief was therefore meritorious and is entitled to be allowed.

### Other Aspects of the Suit

Since the evidentiary record is complete, in the interest of promoting efficiency in court procedures, the court will consider and resolve the other aspects of this litigation, despite its granting of defendant's motion for judgment. Upon so doing, it must be found and concluded that the defendant is entitled to judgment in its favor.

Certain evidentiary comment is deemed to be appropriate before proceeding to frame ultimate findings of fact.

Beginning in about January, 1968, William J. Kearney, RI's president, became acquainted with one Cortland Silver. Silver was engaged in the jewelry trade at Minneapolis, Minnesota, among other places. He was also the owner and guiding force of several corporations engaged in the business of real estate development in Minneapolis and elsewhere. Lorraine was one of such corporate entities.

At that time, Silver expressed his intent to establish a jewelry business in the Quad-Cities area, of which the city of Rock Island, Illinois, is a part. Kearney courted Silver as a potential customer of RI. Ensuing discussion between Kearney and Silver related to prospective proposals by Silver for real estate development in the Rock Island area. In the course of such contacts, Silver advised Kearney, at some time prior to June 5, 1969, that one John Sumner of Jacksonville, Florida, had the control of substantial funds of a religious institution. He suggested to Kearney that Sumner might be persuaded to place certificates of deposit with RI. Ultimately, certain certificates of deposit were so placed by Sumner or his corporation, SFC.

As a result of that interaction between Silver and Kearney, Kearney did issue to Lorraine the letter of credit in suit. As originally issued, that letter was signed only by Kearney, as president of RI.

At some time shortly after June 5, 1969, Sumner met with J. Hugh Rich, executive vice president of NC, and proposed that SFC would broker a loan by NC to Lorraine. He proposed that SFC would, in conjunction with the loan to Lorraine, place with NC certificates of deposit substantially in excess of $400,000. He further proposed that the loan by NC would be guaranteed by the letter of credit in suit. That letter was in Sumner's possession at his initial meeting with Rich.

Rich advised Sumner that NC would require financial statements of both Lorraine and Silver before NC could act upon the loan proposal. He further required as a

---

**8.** The complaint suggests that NC did recognize its burden of proving its status. The complaint contains a factual allegation that NC is a holder in due course of the Lorraine note.

condition for approval of the Lorraine loan that the letter of credit be attested by a second RI officer, and, as a condition for disbursal of the proceeds of the proposed loan, that SFC produce the requisite amount in NC certificates of deposit.

The transaction, as finalized, was structured in the form of a note from Lorraine to SFC, which was in turn endorsed by SFC for discount at NC. Ultimately, NC required that it be provided with resolutions, respectively adopted by the boards of directors of Lorraine and SFC, approving the total transaction. Rich required no such resolution by the board of RI. He made no inquiry as to the authority of RI to issue the guaranty letter, or as to the authenticity of the issued letter, despite the fact that he had never before seen a letter of credit of the type presented to him.

The transaction was finalized at NC on July 31, 1969. Those present were Rich, Sumner, Silver, and possibly another Lorraine representative. The note is on an NC discount form and the same was apparently prepared by NC. Sumner testified that he first saw the note at NC when the transaction was finalized on July 31. The note, executed by Lorraine, runs to SFC, as payee, and the same was endorsed by SFC to NC on that date. NC received the note and the letter of credit in its present form.[9] NC did issue its cashier's check on July 31 to SFC, which was deposited in an account at NC. An impromptu instrument was also drafted and executed, which had the effect of freezing substantially all of that deposit until SFC had fully complied with the obligation to place the requisite certificates of deposit with NC.

The note was payable June 5, 1971, in the amount of $400,000. NC disbursed to SFC the sum of $354,000. Ultimately, SFC disbursed to Lorraine the sum of $300,000 from the proceeds of the note.

Mr. Sumner testified that his corporation advanced no funds of its own to Lorraine. The funds which it did disburse subsequent to July 31 were the funds provided by NC. He further testified that the transaction was, in reality, a loan to Lorraine by NC, which was secured by the RI letter of credit and conditioned upon SFC placing substantial deposits from other sources with NC.

Thus the transaction was structured as a loan by SFC to Lorraine, evidenced by the note and the discounting of that note by NC, upon the endorsement of SFC. The evidence patently reveals that the transaction was in reality a direct loan by NC to Lorraine, channeled through SFC as a broker.[10] The note was dated June 5, 1969, with a stated maturity two years after that date. The transaction was finalized on July 31, 1969. In reality, Lorraine received no monies from anyone until an unspecified time subsequent to the latter date.

There exists some conflict in the evidentiary record as to the reason why this transaction was structured as a discount of a note to SFC, as opposed to a direct loan to Lorraine by NC. In his deposition, Mr. Salisbury, now executive vice president of NC, testified to a conference which he had had with Mr. Rich regarding the initial transaction, and the background thereof. In that context, he testified that he was told by Mr. Rich that the discount structure was employed to avoid the possible consequences of the North Carolina usury laws, inasmuch as the interest rate exceeded six percent. Mr. Salisbury's doodled notes, made during the Rich conference, contain the statement, "Discount note from third party to get around 6% usury ceiling which applied prior to July 1, 1969." Although Mr. Salisbury did, in testimony, attempt to recant that statement,[11] his deposition version does have a tendency to explain why the discount structuring was used, even

---

9. Showing attestation by the cashier of RI.

10. In addition to the testimony of both Sumner and Salisbury, an exhibit reflects that on June 9, 1969, the loan request was submitted to the Board of Directors of NC as a "loan to Lorraine Realty Corporation in the amount of $354,-

000.00, due June 5, 1971," and "based on a letter of credit" issued by RI.

11. He testified that he realized by the time of trial that he had misunderstood what Rich had stated to him.

though in reality a direct loan from NC was involved.[12]

It further appears that NC was informed prior to closing the transaction that RI was assuming the credit risk but not making a direct loan to Lorraine, because RI had approached its legal lending limits upon loans to a single borrower.[13]

The ultimate facts must be found within the parameters of the above evidentiary summary and comments.

### Ultimate Findings of Fact

1. NC was a co-originator of the Lorraine note.

2. The transaction was structured by NC, with the appearance of its being the discounting by NC of a previously existing note to SFC, with SFC interposed as a loan broker or loan arranger.

3. Although the Lorraine transaction was initially proposed by Sumner, NC, acting through Rich, was the controlling force in structuring and consummating the transaction.

4. At the time when the loan was closed, NC had reason to believe that it contra-vened the usury statutes of the State of North Carolina. At the same time, NC was advised, through information available to Rich, that the letter of credit was a device to enable RI to avoid the lending limits imposed by the Banking Act of the State of Illinois.

5. It is necessary to find that the subterfuge of disguising the transaction as the discounting of a note payable to SFC was designed by NC as a device to insulate itself against the North Carolina usury statutes.

6. Rich had never before seen a guaranty letter of credit of the type involved here. Although he did demand and obtain "attestation" by the cashier of RI, he made no effort to ascertain whether RI had authority to issue the letter, or whether RI had in fact authorized issuance of the letter. Although Rich did require certification of formal resolutions of Lorraine and SFC approving the transaction, he did not require or seek any confirmation from RI, the party that assumed ultimate liability.[14]

7. The evidence as a whole compels the finding that NC did not take the Lorraine note in good faith, and that NC is not a holder in due course of the instrument.

---

12. The record reflects that NC did, at a later date, when the statutes had been amended to remove the usury ceiling as to corporate borrowers, make at least one direct loan to Lorraine.

13. Any intent to evade the statutory lending limits could not be attributed to RI as an institution. The letter of credit was not authorized by RI. The evidence admits no doubt that Kearney did not have the authority to issue the letter without prior approval by the RI loan committee or board of directors, or both. The letter was not authorized by the board of RI, and the evidence reflects that the board had no knowledge thereof until existence of the letter was directed to its attention by examiners for the Federal Reserve System at a time in 1970.

14. When questioned as to why he had not sought such confirmation, Rich stated in his deposition, in effect, that he had not done so because banking laws are restrictive. It is difficult to divine just what that statement means.

If it is exculpatory, as obviously must have been intended, the witness must have been saying that the signature of a bank president is sacrosanct assurance that the document signed was authorized by the banking laws and by the issuing bank. If the same be inculpatory, then it means that Rich recognized that inquiry might disclose the possible illegality or irregularity of the document.

No matter what the interpretation of Rich's explanation, his knowledge that the letter of credit was designed to avoid Illinois lending limitations was notice to him of the potential infirmity of the letter. It would seem to have been incumbent upon NC to inquire and ascertain whether the letter of credit was a commitment which RI had authorized.

The evidentiary record made in this case would indicate that this letter of credit was not a routine banking transaction. Mr. Kearney signed the letter, although he had never before seen an instrument of that nature. Mr. Rich accepted the letter without reservation, despite the fact that he had never before seen an instrument of that nature.

RI argues that there existed no apparent authority in Kearney to issue this letter. That question need not be resolved in the context of this evidentiary record. If apparent authority be assumed, the totality of the evidence related to the Lorraine transaction is deemed to refute the contention that NC took the Lorraine note in good faith.

8. All matters stated herein, in any context whatsoever, which partake of the quality of findings of fact, are so found.

### Conclusions of Law

1. The court has jurisdiction of the parties and subject matter.

2. This cause is a suit upon the contract created by the letter of credit, not a suit upon the promissory note. Before it can recover, plaintiff must prove its own compliance with the contract, and that it did meet all conditions thereof upon which its right to recovery depends. *Dick v. Halun*, 344 Ill. 163, 165, 176 N.E. 440 (1931); *Kuperman v. Leak*, 20 Ill.App.3d 491, 314 N.E.2d 504, 506 (1st Dist. 1974); *Browzin v. Catholic University of America*, 174 U.S. App.D.C. 60, 527 F.2d 843, 849 (1975).

3. NC had the burden of proving that it is a holder in due course, in a substantive sense, of the Lorraine note, in view of the limitation in the letter of credit that the note would be purchased by RI, only, from "a holder in due course."

4. The procedural provisions of Section 3–307 of the UCC, allocating burdens of proof, have no bearing upon the allocation of burden of proof in this suit upon a contract which is collateral to the Lorraine note.

5. It is not surprising that the holder in due course issue is considered in reported decisions in the context of the procedural provisions of Section 3–307, inasmuch as the issue usually arises in the course of a suit upon the negotiable instrument itself. It is also not surprising that the context of that issue is almost universally framed with reference to the existence of some specific defense to the note. Thus there is no judicially-stated substantive definition of "holder in due course," apart from reference to the language of Section 3–302.

6. The substantive concept of the holder in due course is characterized by the requirement of complete innocence on the part of a party claiming that status. Such a holder must have taken a negotiable instrument which is apparently regular upon its face for value. He must have acted in complete good faith, without his knowledge of any fact or circumstance to indicate that the instrument, or the transaction which produced the instrument, rendered the instrument subject to any infirmity. He must have relied in good faith upon the integrity apparent upon the fact of the instrument itself. Finally, he must have had no knowledge of any defense to the instrument.

7. A co-originator of a note is deemed to have notice of all matters affecting the transaction. If there are infirmities affecting the transaction, as co-originator it cannot assert its lack of knowledge or its good faith in the premises. *Winter & Hirsch, Inc. v. Passarelli*, 122 Ill.App.2d 372, 259 N.E.2d 312 (1970); *Admiral Leather Corp. v. Manchester Modes, Inc.*, 422 F.Supp. 387, 389 (S.D.N.Y.1976). Such a person is not a holder in due course of the instrument.

8. Good faith and lack of knowledge are negatived by the fact that a loan transaction is artificially structured as a discount transaction when it is , in fact, a direct loan, and by evidence that that structuring was adopted as a device to evade the usury statutes of one state and to subvert lending limitations fixed by the statutes of a second state.[15]

9. The question whether Lorraine would have a defense to the note has no relevant bearing upon the legal issues presented in this cause.[16]

---

**15.** There is no reason to consider the question whether this letter of credit is exempted from the lending limits fixed by the Illinois Banking Act. The testimony of NC's officer responsible for the transaction discloses that he was advised that the letter of credit was designed to avoid the restrictions imposed by the Illinois Act. The fact of good faith cannot be shown when it thus appears that NC had information that the letter was a device designed to circumvent that Act.

**16.** There is no reason to pursue the question whether the Lorraine note was usurious, nor the legal effect upon the borrower's obligation under North Carolina law, if the note in fact be usurious.

10. NC was not a holder in due course of the Lorraine note as a matter of law.

11. All statements herein whatsoever, which partake of the character of conclusions of law, are so concluded.

12. RI is entitled to judgment upon the merits of this complaint. In view of the fact that the court has concluded that the motion of RI for judgment at the close of plaintiff's case is meritorious, judgment will be entered upon that motion alone, despite the fact that judgment upon the merits in its favor is also merited.

IT IS ORDERED that judgment is entered for RI and against NC, upon the motion for judgment, that NC take nothing by its complaint, and that RI recover from NC its costs of suit.[17]

---

17. RI also argues that there was not an unconditional tender to it, because the tender stated, in effect, that the endorsement of SFC upon the note would not enure to the benefit of RI. As a corollary to that position, RI contends that NC did not mitigate damages, in that it failed to proceed against SFC upon the note within the times fixed by applicable statutes of limitations. That contention need not be pursued, in the light of the judgment entered herein.