**BANK OF NORTH CAROLINA, N. A.,
Plaintiff–Appellant,**

v.

**The ROCK ISLAND BANK, an Illinois
Corporation, Defendant–Appellee.**

No. 79–1787.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1980.

Decided Sept. 22, 1980.

---

Robert Noe, Moline, Ill., for plaintiff–appellant.

George Bobrinskoy, Chicago, Ill., for defendant–appellee.

Before SPRECHER, BAUER and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

The Bank of North Carolina, N. A. ("NC"), brought this action to recover under a letter of credit issued by the Rock Island Bank ("RI") to its customer, Lorraine Realty Corporation ("Lorraine") in 1969.[1] The letter of credit contemplated that Lorraine would give a third party its promissory note which would mature on June 5, 1971. In its letter of credit RI promised to pay any amount which remained due under Lorraine's note on June 5, 1971, to any holder in due course of the note. NC acquired the note and presented it to RI, claiming that it was a holder in due course and demanding payment under the letter of credit. RI refused to pay so NC brought the instant suit.

The district court held that NC was not entitled to recover under the letter of credit for several reasons.[2] First, it held that the burden was on NC to prove that it was a holder in due course as part of its prima facie case and NC had not adduced the proof necessary to show it was a holder in due course. The court rejected NC's argument that under the Uniform Commercial Code a holder of a note is entitled to recover and does not bear the burden of proving that it is a holder in due course unless a defense against the note is established. Ill. Rev.Stat. ch. 26, § 3–307(3).

Second, the district court held that NC was a "co–originator" of the note and therefore should be deemed to have notice of all matters affecting the transaction. Thus NC could not have taken the note in good faith and without notice of defenses to it. Further, the court found that NC had "reason to believe" that (1) the note violated the North Carolina usury statute and (2) the letter of credit was a device to enable RI to avoid the lending limits of Illinois law. The district court did not find it necessary to decide whether these provisions of North Carolina and Illinois law were in fact violated.

Third, the district court found that although the letter of credit was signed by RI's president, he did not have authority to issue the credit. The court further found that even if the president had apparent authority to issue the letter of credit, the circumstances surrounding its issuance indicated that NC did not take the Lorraine note in good faith. The court concluded that NC was therefore not a holder in due course within the meaning of Ill.Rev.Stat. ch. 26, § 3–302, because NC did not take

1. In *Bank of North Carolina, N. A. v. Rock Island Bank*, 570 F.2d 202 (7th Cir. 1978), this Court determined that RI's letter was a letter of credit within the meaning of Article 5 of the Uniform Commercial Code, Ill.Rev.Stat. ch. 26, § 5 101 *et seq.*

2. The district court opinion is reported at 471 F.Supp. 1301 (C.D.Ill.1979).

Lorraine's note in good faith and without knowledge of defenses to it. Since NC was not a holder in due course, the court held that NC could not recover under RI's letter of credit.

Since we find that Ill.Rev.Stat. ch. 26, § 3–307 applies to the instant case, we do not agree that NC must prove, as part of its case in chief, that it is a holder in due course. Section 3–307 provides that if the holder of a negotiable instrument produces the instrument and the signatures are not in dispute, the holder may recover under the instrument unless a defense is established. It is only after a defense is shown to exist that the holder bears the burden of proving that it is a holder in due course. Since no defense to Lorraine's note was established in the instant case, NC did not bear the burden of proving that it was a holder in due course, and the judgment of the district court is therefore reversed. RI has not established a valid defense to the letter of credit itself (such as, for example, lack of apparent authority to issue the letter of credit), so we direct the district court to enter judgment in favor of NC.

### 1. *Facts*

In early 1969, William J. Kearney, RI's president, became acquainted with Cortland J. Silver. Silver owned Lorraine (as well as several other businesses) and Kearney hoped that Silver would become a customer of RI. Silver advised Kearney that a certain John Sumner controlled the funds of a religious institution, which might be deposited in RI. Sumner later caused several certificates of deposit to be placed with RI.[3] In return for Silver's help in arranging this transaction with Sumner, Kearney issued the letter of credit in question to Lorraine, Silver's corporation.[4]

Sumner later met with J. Hugh Rich, executive vice president of NC, and suggested that NC loan money to Lorraine. The proposed loan would be secured by RI's letter of credit, which Sumner then had in his possession. Sumner also offered to have his corporation, Sumner Financial Corporation ("SFC"), place certificates of deposit in excess of $400,000 with NC in conjunction with NC's loan to Lorraine.

The loan was finally structured as a two-year, $400,000 note. Lorraine was the maker and SFC was the named payee. NC requested and received resolutions of the boards of directors of Lorraine and SFC approving of the transaction. NC did not require a resolution from the board of directors of RI, although Kearney's signature was subsequently attested by RI's cashier, as NC requested.

The transaction was negotiated to final agreement on July 31, 1969, although the note was dated June 5, 1969. At that time SFC endorsed the note to NC for discount and received $354,000 from NC. Lorraine received $300,000 of this amount from SFC and SFC retained $54,000. There is some evidence that the transaction was structured in this way in order to avoid North

---

3. Sumner does not appear to have had an ownership interest in any of Silver's enterprises.

4. The letter was written on RI's letterhead, dated June 5, 1969, and provided:

   Lorraine Realty Corporation
   748 South Mississippi Boulevard
   St. Paul, Minnesota 55116
   Gentlemen:
   We hereby issue to Lorraine Realty Corporation, 748 South Mississippi Boulevard, St. Paul, Minnesota, our irrevocable and unconditional commitment to purchase your Promissory Note of this date in the amount of $400,000.00, said Promissory Note to bear a maturity date of June 5, 1971.
   We will purchase said Promissory Note from its holder in due course at maturity, provided

   the holder of such Promissory Note shall give us at least 60 days written notice of its intent to sell to us prior to delivery date, said delivery date not to be prior to maturity date of June 5, 1971.
   We hereby agree with the drawers, endorsers, and bona fide holders that this credit will be duly honored on presentation in an amount not to exceed unpaid balance of principal and interest due upon presentation.
   
   Yours very truly,
   /s/ William J. Kearney
   William J. Kearney
   President
   Attested:
   /s/ B. T. Olson
   B. T. Olson, Cashier

Carolina's 6% usury ceiling which applied prior to July 2, 1969. There is also some evidence that RI had issued the letter of credit rather than making a direct loan to Lorraine because RI did not want to exceed the lending limit on loans to a single borrower imposed by Illinois law.

NC gave RI notice of its intent to tender the note for payment under the letter of credit when it matured on June 5, 1971. RI received the note on June 8, 1971, and refused to pay so NC brought the instant suit.

### 2. Burden of Proof on the Holder in Due Course Issue

NC brought this action to enforce RI's letter of credit. Both parties agree that the letter of credit is governed by Article V of the Uniform Commercial Code (as enacted in Illinois, Ill.Rev.Stat. ch. 26, § 5–101 *et seq.*). Section 5–114(1) provides that the issuer of a letter of credit "must honor a draft or demand for payment which complies with the terms of the relevant credit . . . ." Section 5–115(1) states that

> When an issuer wrongfully dishonors a draft or demand for payment presented under a credit the person entitled to honor . . . may recover from the issuer the face amount of the draft or demand together with incidental damages under Section 2–710 on seller's incidental damages and interest. . . .

If the issuer wrongfully repudiates the credit before a demand for payment has been made, the beneficiary may have "an immediate right of action for wrongful dishonor." § 5–115(2). However Article V does not indicate whether the person seeking to recover under the letter of credit bears the burden of proof on the question whether he is "the person entitled to honor" (in terms of this case, whether NC is a "holder in due course" within the meaning of RI's letter of credit).

At the close of NC's case RI moved for a judgment of involuntary dismissal under Fed.R.Civ.P. 41(b) on the ground that NC had not sustained its burden of proving that it was a holder in due course. After RI presented its case the district court ruled in RI's favor on this motion. The court based its conclusion on the general rule that a plaintiff must prove that it complied with all the conditions of a contract before it is entitled to recover under it. *Dick v. Halun,* 344 Ill. 163, 176 N.E. 440 (1931); *Kuperman v. Leak,* 20 Ill.App.3d 491, 314 N.E.2d 504 (1974).

NC argued in the district court that Ill.Rev.Stat. ch. 26, § 3–307 governs the allocation of the burden of proof on the holder in due course issue in the instant case. Section 3–307 provides:

> Burden of Establishing Signatures, Defenses and Due Course
>
> (1) Unless specifically denied in the pleadings each signature on an instrument is admitted.
>
> . . . .
>
> (2) When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense.
>
> (3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course.

Thus under § 3–307, if the holder introduces the instrument and the signatures are not disputed, the holder is entitled to recover unless a defense to the instrument is established. In effect, § 3–307 incorporates a burden–shifting principle which makes a "holder" the functional equivalent of a "holder in due course" *until a defense has been shown to exist.* The burden of establishing a defense is on the defendant, "not only in the first instance but by a preponderance of the total evidence." Comment 2 to Ill.Ann.Stat. ch. 26, § 3–307, p. 204 (Smith–Hurd 1963). If a defense is established and the holder asserts the rights of a holder in due course, the holder then has the burden of establishing that status "by affirmative proof that the instrument was taken for value, that it was taken in good faith, and that it was taken without notice (Section 3–302)." Comment 3 to Ill.Ann.

Stat. ch. 26, § 3–307, p. 205 (Smith–Hurd 1963).

In the instant case the parties apparently agree that the term "holder in due course" is defined by various provisions of Article III of the Uniform Commercial Code (as enacted in Illinois, Ill.Rev.Stat. ch. 26, § 3–101 *et seq.*).[5] Section 3–302 provides that a holder is a holder in due course if it took the negotiable instrument for value in good faith and without notice that it is overdue, has been dishonored or of any defense or claim against it. A holder in due course takes the instrument free of all defenses and claims except the so–called "real" defenses listed in § 3–305. If NC were a holder in due course (or a holder against whom no defense had been established) and RI had purchased the note from NC as contemplated by the letter of credit, RI could assert the rights of a holder in due course (or of a holder against whom no defenses had been raised, as the case might be) because, in general, "[t]ransfer of an instrument vests in the transferee such rights as the transferor has therein ...." Ill.Rev.Stat. ch. 26, § 3–201. Thus the question presented is whether the term "holder in due course" in the letter of credit is properly construed as reflecting and incorporating both the substantive and the procedural aspects of Article III.

Article III includes both substantive and procedural sections which are designed to foster the free circulation of negotiable instruments. Thus a holder is entitled under § 3–307 to recover unless a defense is asserted, and a holder in due course may recover in spite of many defenses which, if established, would defeat a mere holder. *See* §§ 3–305 and 3–306. Section 3–307's allocation of the burden of proof is a central aspect of the Code's policy of encouraging the transfer of negotiable instruments because § 3–307 assures a holder

> that should he acquire HDC status he will not incur high transaction costs in the form of protracted litigation when seeking to enforce the contract. . . .

The purpose of the rule would be largely defeated if one seeking HDC status could be frequently compelled to meet a difficult burden of proof concerning his entitlement to the protected status. *Western State Bank of South Bend v. First Union Bank & Trust Co. of Winamac*, 360 N.E.2d 254, 258 (Ind.App.1977).

Given that § 3–307 is the procedural mechanism for achieving the Code policy expressed in other substantive sections of Article III, application of the section should not be limited to cases in which a holder brings suit on the instrument itself, as the district court held. Rather, we must bear the burden–shifting provisions of § 3–307 in mind in a suit to enforce a letter of credit which involves a question of how the term "holder in due course" is to be interpreted.

At least one other court has reached a similar conclusion. *See United Bank, Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976). In *United Bank*, Cambridge arranged for a letter of credit such that Cambridge's bank would honor drafts drawn on it by Duke, a Pakistani company, from whom Cambridge wished to purchase goods. Duke drew two drafts pursuant to the letter of credit which it made payable to United Bank. United Bank then sought payment on the drafts under the letter of credit, claiming that it was a holder in due course. (Cambridge had enjoined its bank (the issuer) from paying the drafts in a separate action so Cambridge stood in the position of the issuer and was the defendant in United Bank's suit.)

The issue presented by *United Bank* was whether United Bank or Cambridge had the burden of proof on the holder in due course issue. The trial court had held that Cambridge had the burden of proving that United Bank was not a holder in due course, and the Appellate Division of the Supreme Court affirmed its decision. The Court of Appeals reversed, holding that even though the suit was brought to enforce the letter of credit and not to collect on the negotiable

---

**5.** The effectiveness of the signatures on the note has not been disputed by RI. It also

appears that NC is a holder. *See* Ill.Rev.Stat. ch. 26, § 3 202.

instrument itself, § 3–307 governed the allocation of the burden of proof on the holder in due course issue. The Court of Appeals held that since Cambridge (standing in the shoes of the issuer) proved that Duke had fraudulently shipped nonconforming goods, Cambridge had established a defense to the instrument sufficient under § 3–307 to shift the burden of proof on the holder in due course issue to United Bank. The court further held that United Bank had not shown by "affirmative evidence" that it was a holder in due course, so United Bank was not entitled to recover on the letter of credit.

The instant case is similar to *United Bank* in that here RI has agreed to pay the holder in due course of a negotiable instrument (Lorraine's promissory note) and the question is whether NC is a holder in due course within the meaning of the letter of credit. Although in *United Bank*, unlike the instant case, defenses to the negotiable instrument were established, the analysis employed in United Bank should be used here since there is nothing to suggest that the parties did not intend the burden–shifting principles of § 3–307 to apply.

■ In essence, it is meaningless to attempt to construe the term "holder in due course" without adopting the basic analytical scheme of Article III, which in large part codifies the prior law of negotiable instruments. In this respect a basic category is that of "holder" who, in order to encourage the transferability of negotiable instruments, is presumptively entitled to recover on the instrument. However, as a matter of substantive law, a holder cannot recover if "personal" defenses to the instrument are raised unless the holder can establish that he is a "holder in due course." Thus the concept of "holder in due course" is contingent and functionally indistinguishable from the concept of "holder" unless a personal defense[6] to the instrument has been appropriately raised. The allocation of the burden of proof with respect to

"holder" and "holder in due course" incorporated in § 3–307 is thus an integral part of the substantive concept of "holder in due course." It it is therefore reasonable to apply § 3–307 to the proof of NC's status as a holder in due course in the instant case.

We also note that there is no evidence to indicate that this result conflicts with the intention of the parties as expressed by the language of the letter of credit itself. Even if the letter of credit could properly be characterized as ambiguous on this point, under Illinois law "[a]ny ambiguity shall be construed most strongly against the person who prepared the contract." *Herbert Shaffer Associates, Inc. v. First Bank of Oak Park*, 30 Ill.App.3d 647, 653, 332 N.E.2d 703, 708 (1975). Following this principle, the ambiguity in RI's letter of credit must be resolved against RI. This is especially appropriate in the instant case because RI issued the credit before Sumner approached NC about the loan to Lorraine, so NC could not have played any role in RI's choice of language.

We also note that RI is an "issuer" and NC is a "beneficiary" of the letter of credit within the meaning of Ill.Rev.Stat. ch. 26, § 5–103. And "as between the beneficiary of a letter of credit and the issuer . . . if ambiguity exists, the words are taken as strongly against the issuer as a reasonable reading will justify." *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 466 (2nd Cir. 1970). Given the importance of § 3–307 to the Code's policy of encouraging the use of commercial paper, a reasonable interpretation of this letter of credit in these circumstances demands that the term "holder in due course" be construed in light of all the provisions of Article III, including § 3–307.

For these reasons we conclude that the district court erred in refusing to apply § 3–307 to allocate the burden of proof with respect to "holder in due course."

6. Even a holder in due course cannot recover if a "real" defense has been established. *See* § 3 305.

### 3. Defenses to the Promissory Note

As noted, under § 3–307 NC need not prove that it is a holder in due course unless RI establishes a defense to the note. RI argues that the transaction was illegal because it was designed to circumvent North Carolina usury law and Illinois lending limits. RI also claims that NC could not be a holder in due course because it was a "co–originator" of the loan to Lorraine. Each of these possible defenses will be discussed in turn.

### A. Usury

■ If RI established by a preponderance of the evidence that the Lorraine note violated the North Carolina usury statute and that usury was a defense to the note under North Carolina law, the burden of proving holder in due course status would under § 3–307 shift to NC.[7] *See Winter & Hirsch, Inc. v. Passarelli*, 122 Ill.App.2d 372, 259 N.E.2d 312 (1970); *Warren v. Lopatin*, 475 F.2d 1329 (D.C. Cir. 1973). The district court found that "NC had reason to believe that it contravened the usury statutes of the State of North Carolina" and that the transaction "was designed by NC as a device to insulate itself against the North Carolina usury statutes." 471 F.Supp. 1301, 1307 (C.D.Ill.1979). However, the court did not decide whether the Lorraine note was in fact usurious. *Id.* at 1308 n. 16.

There is some question whether the interest RI charged on the Lorraine note was usurious under North Carolina law because the usury statute was amended effective July 2, 1969. NC argues that the loan is not usurious because the funds were not advanced until July 31, 1969, and at that time the statute allowed the parties to a loan of more than $300,000 to agree to any rate of interest. N.C.Gen.Stat. § 24–1.1 (1969). RI maintains that the prior law should govern because it was in effect on

June 5, 1969, the date which appears on the note.

■ However, it is not necessary to resolve this question because RI has not established that usury is a defense to a suit to enforce a note under North Carolina law. If a usurious rate of interest has knowingly been charged, the entire interest due on the note must be forfeited. N.C.Gen.Stat. § 24–2. Further, if usurious interest has been paid, the party which paid it may recover twice the amount of interest actually paid either in the creditor's action to recover the principal amount of the debt or in a separate action brought by the debtor. *Id.* Thus the promise to pay *interest* is void but the payee of the note or a holder may still recover the principal amount due under the note.[8] *Federal Reserve Bank of Richmond v. Jones*, 205 N.C. 648, 172 S.E. 185 (1934); *Hansen v. Kessing Company*, 15 N.C.App. 554, 190 S.E.2d 407 (1972), *cert. denied.*

RI has not argued that any part of the sum NC seeks to recover in the instant case is interest on the original Lorraine note before maturity, so we assume that NC is only attempting to recover principal, which is permissible under North Carolina law even if usurious interest had been charged. Therefore since RI has not established that usury is a defense to the note and, as indicated, the district court made no finding that such a defense had been established, RI has not sustained its burden of proof.

### B. Lending Limits

In his deposition, Rich stated that he asked Summer and Silver why RI had issued a letter of credit instead of making a loan to Lorraine, and they both indicated that RI was approaching its legal lending limit with regard to its loans to Silver. Deposition of Rich, pp. 118–21. The district

---

7. Usury may be a defense to a promissory note sufficient to shift the burden of proof under § 3 307 and it may, under applicable law, also be a "real" defense which would prevent a holder in due course from recovering under the note. *See* Ill.Rev.Stat. ch. 26, § 3 -305(2)(b) and § 3 306(b).

8. We recognize that usury would be a defense to an action by a holder (or a holder in due course) if the usury statute made a usurious loan void from its inception. *See* § 3–305; *Ward v. Sugg*, 113 N.C. 489, 18 S.E. 717 (1893); *United States National Bank of New York v. McNair*, 116 N.C. 550, 21 S.E. 389 (1895).

court found that NC was advised that the letter of credit was a "device to enable RI to avoid the lending limits imposed by the Banking Act of the State of Illinois" and this knowledge made it impossible for NC to take the note in good faith and without knowledge of defenses. 471 F.Supp. at 1307–08. However, the court did not consider whether the letter of credit was exempt from the lending limits fixed by Illinois law. *Id.* at 1308 n.15.

■ Ill.Rev.Stat. ch. 16½, § 132 specifies that the total liability of any one person to a state bank shall not exceed 15% of the bank's capital or its surplus.[9] We do not find it necessary to decide whether a violation of this statute by means of RI's issuance of a letter of credit would constitute a defense to Lorraine's note because in 1969 letters of credit were expressly exempted from the operation of § 132 by Ill.Rev.Stat. ch. 16½, § 134(5). Section 134(5) states that lending limits shall not apply "[t]o the issuance, advice, or confirmation of letters of credit."

Thus, as a matter of law, RI's letter of credit did not violate Illinois law, and RI's attempt to avoid the Illinois lending limits by use of a letter of credit, even if proven, was perfectly legal. The fact that NC may have thought that the letter of credit was issued in order to circumvent Illinois lending limits does not constitute a defense to Lorraine's promissory note. Therefore nothing shifts the burden of proof under § 3–307.

### C. *Co–originator*

The district court found that NC was a "co–originator" of the Lorraine note so NC would not claim good faith or lack of knowledge of any "infirmities affecting the transaction." 471 F.Supp. 1307–08. The district court relied on *Winter & Hirsch, Inc. v. Passarelli*, 122 Ill.App.2d 372, 259 N.E.2d 312 (1970), in which the holder of an admittedly usurious note was deemed a co–originator because it advanced funds for the loan to the named payee before the loan

was formalized. "As a co–originator it is charged with the knowledge of the terms of the loan" and the terms made it clear that the interest charged was usurious. 122 Ill. App.2d at 377, 259 N.E.2d at 315.

■ RI argues on appeal that NC cannot be a holder in due course because the district court found that NC is a co–originator. We reject this argument because, under § 3–307, co–originator status would not be relevant until RI established a defense to the promissory note. If RI had established such a defense, the burden of proof would have shifted so that NC would have had to prove that it took the note in good faith and without knowledge (*i. e.*, that it was a holder in due course). But it is only after a defense is shown to exist that NC's status as co–originator could become relevant. It is true that a co–originator is presumed to have knowledge of all aspects of a transaction, including possible defenses. But since RI failed to establish any defenses to the note, NC could recover on the letter of credit even if it were a co–originator.[10]

### 4. *Defenses to the Letter of Credit*

### A. *Apparent Authority*

■ The district court found that Kearney did not have actual authority to execute the letter of credit on behalf of RI, but it did not decide whether Kearney had apparent authority. 471 F.2d at 1307, nn.13 and 14. In general,

> Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf. [citation omitted]. The principal, having placed the agent in a situation where he may be presumed to have authority to act, is estopped as against a third person from denying the agent's apparent authority. *Crawford Savings & Loan Association v. Dvorak*, 40 Ill.App.3d 288, 292–93, 352 N.E.2d 261, 264 (1976).

---

**9.** RI has not submitted any evidence to establish that its loans to Silver's enterprises ever exceeded 15% of RI's capital or surplus.

**10.** We do not find it necessary to decide whether the district court correctly determined that NC was a co–originator.

NC argues on appeal (as it did in the district court) that Kearney had apparent authority to execute the letter of credit in question so RI is estopped to deny Kearney's authority. NC's argument is premised on the fact that RI made Kearney its president and:

> Under the settled rule in this state, the president of a corporation, by virtue of his office, is the business head thereof, and any contract pertaining to the corporate affairs, within the general powers of the corporation, will, when executed by the president and in the absence of proof to the contrary, be presumed to have been executed by the authority of the corporation, as one of the powers incident to the office of president. [citation omitted]. . . . [T]he general public dealing with the person in whom the corporate body avowedly reposes such confidence ought not to be required to search for the precise authority of the president to fulfill each ordinary and usual function of his office; if the president is unworthy of trust in the execution of the ordinary business affairs of the corporation, then it seems more equitable that the corporation, rather than the persons dealing with it, should suffer. *Krantz v. Oak Park Trust & Savings Bank,* 16 Ill.App.2d 331, 334–35, 147 N.E.2d 881, 882 (1958).

RI does not dispute this principle. Rather, RI argues that the president of a corporation does not have apparent authority to enter into unusual or extraordinary contracts, citing *Southwest Forest Industries, Inc. v. Sharfstein,* 482 F.2d 915, 925 (7th Cir. 1972) and *Central Republic Trust Company v. Evans,* 378 Ill. 58, 37 N.E.2d 745 (1941). In *Sharfstein,* this Court noted that an officer of a corporation did not have authority, in the absence of action by the board of directors, to agree to pay a percentage of the profits of the corporation to an employee as compensation because such an agreement "is not the usual and ordinary contract which a person authorized to offer employment may make without specific authority of the corporation. [Citation omitted]." 482 F.2d at 925. Similarly, in *Central Republic Trust, supra,* the court held that the release of debtors from their obligations to the bank without consideration is not an ordinary duty or power of the bank's president so the bank was not bound by the president's action. 378 Ill. at 66, 37 N.E.2d at 749.

■ However, in the instant case, there is no reason to conclude that the letter of credit was such an unusual or extraordinary contract that NC could not rely on Kearney's apparent authority to execute it on behalf of RI. This Court has already established that this letter of credit is enforceable under the Illinois Banking Act and the Uniform Commercial Code even though it is in some respects a guaranty of Lorraine's debt. *Bank of North Carolina,* 570 F.2d at 204–08. There is also evidence in the record which indicates that various other banks had issued similar letters of credit which induced NC to make loans to Lorraine. Transcript of proceedings on February 6, 1979, pp. 72–75. We conclude that RI's letter of credit was not so unusual or extraordinary that NC should have inquired into Kearney's actual authority. Nor would Kearney's apparent unfamiliarity with letters of credit change this conclusion. Deposition of Kearney, pp. 38–39. RI is therefore estopped to deny that Kearney had authority to execute the letter of credit.

### B. Tender of the Note

RI also argues that NC did not make a proper tender of the Lorraine note because in NC's letter of June 1, 1971, to RI, NC stated that "the endorsement of the Sumner Financial Corporation does not inure to the benefit of" RI. RI contends that this statement violates Ill.Rev.Stat. ch. 26, § 5–110(2) which provides that

> Unless otherwise specified a person by presenting a documentary draft or demand for payment under a credit relinquishes upon its honor all claims to the documents and a person by transferring such draft or demand or causing such presentment authorizes such relinquishment. An explicit reservation of claim makes the draft or demand non–complying.

The comments which accompany this section indicate that this provision was intended to enable an issuer which has honored the draft or demand for payment to take the relevant documents free from any ownership claims which the beneficiary may assert. Comment 2 to Ill.Ann.Stat. ch. 26, § 5–110, p. 589 (Smith–Hurd 1963). NC's letter of June 1, 1971, does not reserve any claim to Lorraine's note so the demand for payment was not noncomplying within the meaning of § 5–110(2).

If NC's letter reflected an agreement between NC and SFC to discharge SFC from its liability on the note as an endorser, RI might have found itself in a less favorable position because it could not recover from SFC on the note if SFC were discharged. *See* §§ 3–414 and 3–601(2). However, it does not appear that NC agreed to release SFC because in NC's May 31, 1971, letter to SFC, NC stated that

> We are presenting the note in the amount of $400,000 . . . [to RI] through the Federal Reserve Bank. We are attaching to this letter copies of two letters we have received [from RI] saying that this commitment would be dishonored.
>
> Therefore, we wanted to advise you that if this is dishonored, it will be necessary for us to call on you for payment on the basis of your endorsement of this note.

■ We therefore conclude that the language NC used in its June 1, 1971, letter did not affect the nature of NC's demand for payment under the letter of credit, so RI cannot defend its dishonor of the demand on the ground that the note was not properly tendered.[11]

## 5. Damages

The parties agree that NC tendered the Lorraine note to RI in June 1971, but RI did not purchase it, and Lorraine did not pay it when due on June 5, 1971. Revised Stipula-

tion of Uncontested Facts 8–11. The Lorraine note states that 10% interest per annum will be due on the unpaid principal if the note is not paid in full on June 5, 1971. In 1972, NC and Silver agreed to a repayment plan by which Lorraine would make payments of principal and interest at 6% per annum until the note was paid off. In return for this extension of time Lorraine granted NC its interest in a mobile home park. In October 1974, Lorraine failed to pay NC the amount then due under the new arrangement and made no further payments. Both Lorraine and Silver instituted bankruptcy proceedings in 1975. On June 26, 1972, RI sent NC a letter in which it agreed that NC might agree with Lorraine and SFC to extend the time for payment of the note without prejudice to the positions of RI and NC with respect to the note and the letter of credit, provided that RI first approved the agreement in writing. (RI's written approval is contained in its subsequent letter of July 20, 1972.) Revised Stipulation of Uncontested Facts 12–16 and 18.

### A. Interest Charges

RI apparently admits that if it is liable for having failed to honor NC's demand for payment in June 1971, it must pay interest on the amount of principal which Lorraine had not yet repaid when it defaulted in October 1974.[12] NC argues that RI must pay 10% interest on this amount because the note provided that 10% interest would be charged after maturity. RI contends that the interest rate should be only 6% because the 1972 agreement provided that Lorraine would pay NC interest at a rate of 6%.

■ We reject RI's argument because in 1972, RI agreed that NC could enter into a new agreement with Lorraine "without prejudice" to NC's rights under the 1969 note and the letter of credit. Moreover, NC

---

11. In addition, NC argued that RI had waived any objection it might have had to defects in NC's June 1, 1971, tender of the note because RI did not raise any objection to the form of the tender when it refused to honor its commitment under the letter of credit.

12. Section 5 -115(1) provides that, if the issuer wrongfully dishonors a demand for payment under a letter of credit, the beneficiary may recover interest, in addition to the face amount of the demand and incidental damages.

had tendered the 1969 note to RI in June 1971, so RI must have been aware that the note provided for 10% interest after maturity, but it did not object to that provision. The district court shall, therefore, enter judgment in favor of NC in accordance with the parties' stipulation, including interest of 10% per annum on the outstanding principal.

### B. *Mitigation*

■ RI also argues that NC may not recover because it failed to mitigate its damages by bringing suit to recover on SFC's endorsement. We reject this argument because § 5–115 provides that a beneficiary may recover from the issuer the face amount of the draft or demand for payment under a letter of credit which the issuer has wrongfully dishonored. Nothing in Article V indicates that a beneficiary of a letter of credit must mitigate its damages by trying to recover from someone other than the issuer, and such a rule would reduce the value and discourage the use of letters of credit. We also note that NC did in fact bring suit in October 1975, against SFC on its endorsement, but the suit was dismissed without prejudice because there was little hope of recovering against SFC. August 22, 1978, Deposition of Salisbury, p. 26. For both of these reasons we reject RI's argument that NC cannot recover on the letter of credit because NC failed to mitigate its damages by bringing suit against SFC.

### 6. *Conclusion*

The judgment of the district court is reversed and the district court is ordered to enter judgment in favor of NC in an amount calculated in accordance with this opinion.

REVERSED.