ILLINOIS CONFERENCE OF TEAMSTERS AND EMPLOYERS WELFARE FUND, and John T. Petry, Frank Purdy, Leroy Tinsley, Gerald Reilly, Beryle Redding, Charles Gauwitz, Trustees, Plaintiffs–Appellees,

v.

Mike MROWICKI, individually, d/b/a Double M Trucking, Inc., Defendant–Appellant.

No. 93–1952.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1993.

Decided Dec. 29, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 22, 1995.

James I. Singer (argued), Thomas J. Grady, Schuchat, Cook & Werner, St. Louis, MO, for plaintiffs-appellees.

Jeffrey A. Ryva (argued), Gerard Andrew McInnis, Husch & Eppenberger, Peoria, IL, for defendant-appellant.

Before KANNE and ROVNER, Circuit Judges, and CURTIN, District Judge.*

* Hon. John T. Curtin of the Western District of New York, sitting by designation.

CURTIN, District Judge.

The Illinois Conference of Teamsters and Employers Welfare Fund and its trustees (the "Fund") brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.*, against Mike Mrowicki, a sole proprietor doing business as Double M Trucking ("Double M"). The Fund seeks to recover health and welfare benefit contributions allegedly due, under the provisions of collective bargaining and participation agreements entered into by Double M, on the basis of hours worked by certain "owner-operators" engaged by the company to perform work covered by the collective bargaining agreements. The Fund maintains that the owner-operators were company employees, for whom contributions were required under the terms of the agreements. Mrowicki maintains that they were independent contractors, for whom no contributions were required pursuant to the agreements, and for whom, he contends, contributions would have been illegal under ERISA and the LMRA. He also claims that Double M should be excused from any owner-driver obligations that it might have, because of the actions and representations of three of the Fund's trustees. The district court granted summary judgment to the Fund. We affirm.

## I. Background

At all times relevant to this litigation, Mike Mrowicki was in the construction hauling business under the name of Double M Trucking.[1] In the course of its business, Double M engaged "company drivers," who drove company-owned trucks, and "owner-operators," who drove their own vehicles. Owner-operators' trucks were leased to the company under "equipment leases" mandated by the Illinois Commerce Commission pursuant to the Illinois Motor Vehicle Code, Chapter 95½, § 18–201(8). In other respects, Double M's relationship with its owner-operators seems

---

1. Mrowicki has apparently now ceased operating as Double M.

to have been similar, though not identical, to its relationship with its company drivers.

On April 30, 1986, Double M entered into a collective bargaining agreement ("CBA") with Teamsters Local 722, covering the period May 1, 1986 through April 30, 1989.[2] At the same time, it entered into a Participation Agreement with the Fund. Under the terms of Article 11 of the CBA, and of a second CBA covering the period May 1, 1989 through April 30, 1992, Double M was required to make contributions to the Fund for each hour worked by each employee covered by the CBAs, in accordance with the Agreement and Declaration of Trust governing the Fund.[3] It is undisputed that Double M was obligated to make payments to the Fund on behalf of company drivers, and that the company was delinquent in its contributions for three such employees. It is also undisputed that the company made contributions on behalf of three owner-operators. At issue is whether payments were required on the basis of hours worked by some three or four dozen other owner-operators engaged by Double M between May 1986 and April 1992.[4] The Fund maintains that all of Double M's owner-operators were "employees"

for purposes of the CBAs, and that the company was required to make contributions on their behalf pursuant to Article 11. Mrowicki contends that, with the exception of the three individuals for whom Double M did, in fact, make contributions, the company's owner-operators were independent contractors for whom no payments were necessary.

The CBAs contained no definition of the term "employee." The Fund maintains, however, that Article 25 of the CBAs, which dealt with the employment status of "owner-drivers," established Double M's owner-operators as employees. Article 25, ¶ 1 defined an owner-driver as "an individual, who, in addition to being employed to perform services covered by this Agreement is also the owner of the equipment he uses." Article 25, ¶¶ 1 & 2 established further that all owner-drivers, except those used as subcontractors pursuant to Article 8 of the CBAs,[5] were to be carried on the payroll and treated by employers as employees. Article 25, ¶ 4 provided that employers reserved "the right to control the manner, time, means and details of, and by which the Owner–Driver perform[ed] his services." [6] The Fund maintains that Double

---

2. Pursuant to an agreement with Local 722, Double M adopted the CBA between the Associated General Contractors of Illinois and the Illinois Conference of Teamsters, covering construction in the State of Illinois with the exception of the northeast portion of the state covered by Teamsters Joint Council No. 25.

3. Article 11, ¶ 1 of the CBAs provided that "[t]he Employer agrees to contribute to [the Fund] ... [a specified dollar amount] for each hour worked by each employee covered by this Agreement during the life of this Agreement." The Participation Agreement recognized that Double M had entered into a CBA with Local 722 which contained "a provision by which the undersigned employer agrees to make contributions [to the Fund] for each employee covered by said agreement."

4. The record is not clear as to the precise number of those individuals.

5. The term "subcontractor" was defined at Article 8, ¶ 1(F), as "any person, independent contractor, firm or corporation which performs work covered by this Agreement for a contractor or subcontractor."

6. The full text of Article 25 was as follows:

1. The term "Owner–Driver" means an individual, who, in addition to being employed to perform services covered by this Agreement is also the owner of the equipment he uses. Legal or equitable title must be in the name of the driver. The following provisions shall apply to all Owner–Drivers engaged to perform work covered hereunder, except those who may be used as subcontractors pursuant to Article 8 above.

2. The Owner–Driver shall be carried on the payroll of the Employer as an employee and as such, all the terms and conditions of this Agreement, including Article 4, Procurement of Labor, shall be applicable to him. A separate referral list will be kept for Owner–Drivers.

3. Separate checks shall be issued by the Employer for driver's wages and equipment. The amount of the check for the driver's wages shall not reduce the amount received for equipment compensation.

4. The Employer expressly reserves the right to control the manner, time, means and details of, and by which the Owner–Driver performs his services, as well as the ends to be accomplished and shall be the sole judge of the capability of the Owner–Driver's equipment to perform the work required to be performed.

5. The terms and provisions of this Article are to apply only to single trucks owned and

M's owner-operators were "owner-drivers" under Article 25, that they were not used by the company as subcontractors pursuant to Article 8, and that they were therefore "employees" for purposes of defining the company's obligation to make contributions to the Fund. Mrowicki contends that, to the contrary, Double M's owner-operators were in fact independent contractors under the common law master-servent "right-to-control" test. He maintains that the language of Article 25 should not be read to include them because the term "owner-driver" refers only to individuals *"employed"* to perform services covered by the CBAs, and Double M's owner-operators, being independent contractors, were not "employed" by the company. Further, he argues that even if Article 25 were interpreted as defining Double M's owner-operators as employees for purposes of the CBAs, the company would be precluded, under the LMRA and ERISA, from making contributions to the Fund on behalf of any owner-operators who were, under the common law test, independent contractors rather than employees.

For about two years after entering into its first CBA with Local 722, Double M made no contributions to the Fund on the basis of hours worked by any of its owner-operators. Between May and December 1988, however, it made contributions based on hours worked by one, Russell Schmidt.[7] Contributions based on hours allegedly worked by a second, Roger Bacidore, began in June 1988, and by a third, Dan Hook, in May 1989.[8] The contributions for Bacidore and Hook continued through at least May 1991. Although it is Mrowicki's position that the CBAs did not require Double M to make contributions to the Fund for its owner-operators as a whole, he testified on deposition that he had made payments on behalf of Schmidt because Schmidt was "getting sick," and for Bacidore and Hook because they were "getting ready

to retire" and wanted benefits. He claimed that the contributions were made at the urging of plaintiff-appellee Gerald Reilly, President and Business Agent of Local 722 and, since March 1989, one of the union-appointed trustees of the Fund. In a later affidavit, he made the broad assertion that his understanding from statements made to him by Reilly was that he "would not have to pay any contributions on behalf of any of [his] owner-operators if [he] signed a labor agreement." On deposition, Reilly denied that he had ever told Mrowicki that he should make contributions for some owner-operators but not others.

On March 10, 1989, almost three months before Double M entered into its second CBA with Local 722, Reilly filed a grievance, on behalf of the local, with the Illinois Conference of Teamsters/Associated General Contractors of Illinois Joint Grievance Committee ("JGC"), claiming that Double M had "failed to pay proper Health & Welfare and Pension contributions on behalf of it's [sic] employees including owner/drivers." The JGC, a body established under Article 20 of the CBAs to settle disputes between employers and local unions, and consisting of three union and three employer representatives, heard the grievance at a meeting held on January 10, 1990.

Some time after Local 722's grievance was filed, but before the January 10, 1990 JGC meeting, the Illinois Conference of Teamsters ("Conference") and the Associated General Contractors of Illinois ("Association") issued a "Memorandum of Understanding," which was to be considered part of the CBA covering the period May 1, 1989 through April 30, 1992. The memorandum is undated, but was apparently issued in the summer of 1989. It stated, in pertinent part, that:

The parties ... agree that the Conference shall provide the Association and all

---

operated by an employee covered by this Agreement and shall not apply to a situation in which an employee covered by this Agreement or any other person rents a truck which is not to be operated by the owner of such truck.

7. In August 1989, Double M attempted to make a further contribution based on the hours it

claimed Schmidt had worked in the period April 1987 through April 1988.

8. Double M bookkeeper Dawn DuBois testified at deposition that the company would report to the Fund that Bacidore and Hook had worked 40 hours per week, and would contribute to the Fund on that basis, regardless of how many hours they had actually worked.

signatory contractors with written assurances in behalf of all Local Unions waiving any right to institute legal action under the Subcontractor (Article 8) and the Owner–Driver (Article 25 and Article 26)[9] provisions of the Master Agreement pertaining to owner-drivers (owner-operators) for all past (completed) work....

....

The parties further agree that with respect to use of owner-operators on all work bid after July 26, 1989 the Contractor shall be bound to the Subcontractor and Owner–Driver clauses pursuant to the workable guidelines developed by a special Joint Committee ...

The parties further agree to establish a special Joint Committee to develop workable guidelines for determining who is an owner-operator/independent (sub)contractor versus an owner-operator/employee. The Committee shall base its guidelines on common law rules.

Among the signatories to the memorandum were plaintiff-appellees Charles Gauwitz and Beryle Redding, then President and Vice–President, respectively, of the Conference, who were also trustees of the Fund and union representatives on the JGC. There is nothing in the record to indicate whether a special Joint Committee was ever established as contemplated by the memorandum, or whether guidelines for determining the employment status of owner-operators were ever developed.

The minutes of the January 10, 1990 meeting of the JGC show that the committee reached deadlock on Local 722's grievance at that time. Mrowicki claims that he was told at the meeting—though he fails to identify by whom—that Double M should start making payments to the Fund for owner-operators working on jobs bid on or after a certain date, but that no contributions would be required on the basis of owner-operators' prior work. He asserts that the date in question was July 26, 1989, the day referred to in the Memorandum of Understanding as the date after which all bids for work covered by the CBA would be subject to the proposed new guidelines for determining the employment status of owner-operators. His claim receives some support from the deposition testimony of Gerald Reilly, who had presented Local 722's case to the JGC. Reilly was asked at deposition whether he recalled that at the January 10, 1990 meeting there was "some reference that Mrowicki should start paying on owner-operators working on jobs bid on or after a certain day, but he didn't have to pay for prior days." He agreed that he did, but could not recall who had made the statement.

Two Fund trustees, Charles Gauwitz and Beryle Redding, were present at the January 10, 1990 meeting as members of the JGC, but the record fails to establish what position they took on the question of Double M's obligation to make contributions to the Fund on the basis of work performed by owner-operators. Mrowicki maintains that, at the least, they made no objection to his being told that no contributions for owner-operators would be required on contracts bid before July 26, 1989.

On August 24, 1990, Local 722 submitted a new grievance to the JGC. The wording was similar to that of the grievance filed on March 10, 1989, and it again claimed that Double M had failed to contribute to the Fund for its employees. However, the phrase "including owner/drivers" was omitted. On November 7, 1990, the JGC made a determination that "the claim of the Union be upheld and Company instructed to follow contract and pay benefits." There is nothing in the record to establish whether or not this decision was related to the removal of the words "including owner/drivers" from Local 722's grievance. Likewise, there is nothing to establish whether or not the ruling was intended as a directive to Double M to pay contributions for its owner-operators as well as for company drivers. It is undisputed that after the decision was issued, Double M made no contributions to the Fund for work performed by its owner-operators, other than those made on behalf of two of the individuals referred to above, Roger Bacidore and Dan Hook.

9. Article 26 of the CBAs specified the conditions of use of, and compensation for, owner-driver equipment. It contains no language helpful to the resolution of this case.

The Fund filed suit against Mrowicki on April 26, 1991, seeking a judicial accounting and judgment for the amount of the delinquent contributions for both company drivers and owner-operators. Mrowicki admitted Double M's failure to contribute for three company drivers, and did not oppose the Fund's motion for summary judgment on that issue. He continued, however, to dispute the company's obligation to contribute for owner-operators.

On August 26, 1992, the district court granted summary judgment to the Fund on the issue of liability, holding that the language of Article 25, ¶¶ 1 & 2 of the CBAs, *see supra,* n. 6, clearly established Double M's owner-operators as covered employees for whom contributions to the Fund were required. The court considered, and summarily rejected, Mrowicki's argument that the common law right-to-control test should be applied to determine whether or not Double M's owner-operators were employees or independent contractors.[10]

Mrowicki moved to alter or amend the district court's August 26, 1992 order, arguing that the Supreme Court's decision in *Nationwide Mutual Insurance Co. v. Darden,* — U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), which construed the statutory definition of the term "employee" under ERISA[11] as describing the traditional common law master-servant relationship, required the court to apply the common law right-to-control test in determining the employment status of Double M's owner-operators. The motion was denied on October 6, 1992. On November 10, 1992, however, the court issued a modified order, "to conform with the recent decision in [*Darden* ]." It found that under the CBAs and the equipment leases, Double M had reserved the right to control its owner-operators, and held that this, together with the fact that the trucking industry is heavily regulated by state and local authorities, was sufficient to establish that the owner-operators were employees (citing *Byrnes v. DeBolt Transfer,*

*Inc.,* 741 F.2d 620, 623–24 (3rd Cir.1984), and *General Teamsters, Auto Truck Drivers and Helpers Local 162 v. Mitchell Bros. Truck Lines,* 682 F.2d 763, 766–67 (9th Cir.1982)). The court also found that other undisputed evidence demonstrated that Mrowicki did, in fact, treat the owner-operators as common law employees.

In its November 10, 1992 order, the district court addressed two other pertinent issues. First, it found no merit in Mrowicki's claim that the 1989 Memorandum of Understanding, together with Reilly's testimony concerning what Mrowicki had been told at the January 10, 1990 JGC hearing, relieved Double M of liability for all contributions before July 26, 1989. Second, it noted that the Fund did not oppose Mrowicki's argument that under the terms of the CBAs, Double M could not be held liable for contributions for owner-operators owning more than one truck. It held that the damages computation should not include contributions for owner-operators who owned two or more vehicles.

The district court entered a final judgment on February 4, 1993. Mrowicki thereupon filed a motion to alter or amend the judgment, and for relief from judgment. On March 30, 1993, the district court issued an order denying the motion. In that order, the court restated its reasons for granting summary judgment to the Fund, and elaborated on the factual basis for its finding that there was no genuine issue of material fact as to the status of Double M's owner-operators as employees under the common law right-to-control test. This appeal followed.

## II. Analysis

We review the district court's decision to grant summary judgment to the Fund *de novo. Central States, Southeast and Southwest Areas Pension Fund v. Hartlage Truck Service, Inc.,* 991 F.2d 1357, 1360 (7th Cir. 1993).

---

**10.** The district court also appears to have determined that Mrowicki was collaterally estopped from denying liability for contributions for owner-operators by the November 7, 1990, JGC decision.

**11.** "The term 'employee' means any individual employed by an employer." 29 U.S.C. § 1002(6).

458

## A. Language of the Collective Bargaining Agreements

Section 515 of ERISA, 29 U.S.C. § 1145, provides that when an employer agrees to contribute to a multiemployer pension or welfare plan pursuant to the terms of the plan or to the terms of a collective bargaining agreement, that agreement is enforceable to the extent not inconsistent with the law.[12] *Hartlage*, 991 F.2d at 1360; *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1153 (7th Cir.1989). In the first instance, therefore, we must look to the language of the agreements at issue here to determine the extent of Double M's obligation to make contributions to the Fund. *See Hartlage*, 991 F.2d at 1360.

■ In its Participation Agreement with the Fund, Double M acknowledged that it had entered into a CBA with Local 722 under which it was required to contribute to the Fund "for each employee covered by said agreement." *See supra*, n. 3. Under Article 11, ¶ 1 of the CBAs, the company was required to contribute on the basis of hours worked by "each employee covered by this Agreement." *Id.* The CBAs contained no definition of the terms "employee" or "employee covered by this Agreement," but although Mrowicki argues to the contrary, a careful reading of the language of the CBAs, and particularly of Article 25, makes it clear that Double M's owner-operators must be regarded as having had the status of "employees" under the terms of those agreements.[13]

Article 25 imposed certain conditions on an employer's use of "owner-drivers" to perform services covered by the CBAs. Paragraph 1 defined the term "owner-driver" as "an individual, who, in addition to being employed to perform services covered by this Agreement is also the owner of the equipment he uses." *See supra*, n. 6. It also established that the provisions of Article 25 applied "to all Owner–Drivers engaged to perform work covered hereunder, except those who may be used as subcontractors pursuant to Article 8 above." *Id.* Paragraph 5 made it clear that the provisions of Article 25 applied only to individuals owning and operating single trucks. *Id.* Paragraph 2 provided that "[t]he owner-driver shall be carried on the payroll of the Employer *as an employee* and as such, *all the terms and conditions of this Agreement ... shall be applicable to him." Id.* (emphasis added). The plain meaning of these provisions, when read together, is that all individuals who owned and operated single trucks, and who were engaged to perform services covered by the CBAs, were, unless they were "used as subcontractors pursuant to Article 8," to be carried on their employers' payrolls and be regarded as "employees" covered by all the terms and conditions of the CBAs.

Mrowicki makes no serious claim that Double M engaged its owner-operators "as subcontractors pursuant to Article 8" of the CBAs. He has not attempted to show that Double M complied with the provisions of Article 8 when hiring its owner-operators, or to demonstrate that the company required its owner-operators to conform with the terms and conditions of that Article. Rather, he maintains that there is ambiguity in the language of Article 25 which precludes summary judgment on the issue of the employment status of the owner-operators. He contends that since the definition of "owner-driver" in Article 25, ¶ 1, refers to individuals being *"employed "* to perform services covered by the CBAs, the term could, and indeed should, be interpreted narrowly as referring only to those owner-operators who could be classified as "employees" upon application of the common law master-servant, right-to-control, test. He would thus have us reject a broader and more sensible interpretation of the

12. Section 515 provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.

13. We ignore, for the time being, any possible implications of the 1989 Memorandum of Understanding, which was, by its own terms, intended to be incorporated into the CBA covering the period May 1, 1989 through April 30, 1992.

term "owner-driver"—*i.e.,* that it included *all* owner-operators engaged to perform work covered by the CBAs, whether those individuals might be classified as employees or as independent contractors under the common law—and find that the term did not include any individual who was not a common-law employee.

■■■ Whether a collective bargaining agreement is ambiguous is a question of law which we review *de novo. Hartlage,* 991 F.2d at 1361; *Bennett v. Local Union No. 66,* 958 F.2d 1429, 1434 (7th Cir.1992). If the language of such an agreement lends itself to one reasonable interpretation only, it is not ambiguous and can be construed as a matter of law. *Ooley v. Schwitzer Division, Household Manufacturing Inc.,* 961 F.2d 1293, 1298 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992).

■■■ We find that the contractual language at issue here is susceptible to only one reasonable interpretation, and that it may therefore be regarded, despite Mrowicki's argument to the contrary, as unambiguous. The interpretation we give to Article 25 is straightforward, and wholly consistent with the language of Article 8 of the CBAs. In contrast, Mrowicki's interpretation would create, unnecessarily, inconsistencies and redundancies in the language of the agreements. For example, if, as Mrowicki contends, the term "owner-driver" referred only to employee owner-operators, the phrase "non-employee owner-driver" would have no meaning. Yet, the phrase is used in the CBAs themselves. *See* Article 8, ¶ 1(G). Similarly, interpreting the term "owner-driver" as including only those individuals encompassed by the common law definition of "employee" would render at least one of the provisions of Article 25 of the CBAs superfluous. Under the common law, it is "the hiring party's right to control the manner and means by which the product is accomplished"

that determines whether or not an individual is an employee. *Darden,* —— U.S. at ——, 112 S.Ct. at 1348 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)). Under Article 25, ¶ 4, of the CBAs, employers *"expressly reserve[d]* the right to control the manner, time, means and details of, and by which the Owner–Driver performs his services...." *See supra,* n. 6 (emphasis added). Obviously, this language would be redundant if, as Mrowicki contends, the term "owner-driver" referred only to individuals satisfying the common law right-to-control test.[14]

■■■ Mrowicki also argues that (i) the language of the 1989 Memorandum of Understanding, (ii) the actions of Charles Gauwitz and Beryle Redding in signing the memorandum and in failing to object to Mrowicki being told, at the January 10, 1990 meeting of the JGC that he would not be required to make payments to the Fund for owner-operators on jobs bid before July 26, 1989, (iii) the fact that the JGC deadlocked on Local 722's grievance when it contained the phrase "including owner/drivers," and (iv) the oral representations of Gerald Reilly concerning Double M's obligation to make payments for owner-operators, all demonstrate that there was "tremendous confusion" as to how the term "employee" should be interpreted for purposes of Articles 8, 11 and 25 of the CBAs. But since we find no ambiguity in the language establishing Double M's owner-operators as employees under the CBAs, we need not look to extrinsic evidence of confusion or disagreement between the parties—or, indeed, of any lack of a clear understanding on the part of the Fund as a third party beneficiary—as to how that language should have been interpreted. *Hartlage,* 991 F.2d at 1361 ("[w]e must enforce the terms of the CBAs when those terms are unambiguous"); *Central States, Southeast and Southwest Ar-*

---

**14.** Since Mrowicki makes no explicit claim that Double M's owner-operators were engaged as subcontractors in compliance with Article 8 of the CBAs, it is not clear whether he believes that Article 8 governed, or should have governed, the terms of their hiring. It may be that he takes the position that Double M was free to hire independent contractor owner-operators covered neither by Article 8, nor by Article 25, nor by any other provisions of the CBAs. Such a position would be entirely inconsistent with purposes of the CBAs, which were designed to address the problems of inequities and inequalities in the wages, hours and working conditions of all individuals working in the job classifications covered by the agreements.

eas *Pension Fund v. Independent Fruit and Produce Co.,* 919 F.2d 1343, 1349 (8th Cir. 1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 59, 116 L.Ed.2d 35 (1991) ("whether the employer and the union agree in this case that they knew what they meant … is irrelevant if the written agreement unambiguously expresses something other than what they intended").

The 1989 Memorandum of Understanding gives us pause, because that document was evidently intended by the parties to be incorporated into, and to modify, the 1989–92 CBA. Assuming, arguendo, that incorporation was, in fact, accomplished, we should have to consider any language in the memorandum concerning the employment status of owner-operators as a part of the 1989–92 CBA, rather than as extrinsic evidence of the parties' understanding of the status of those individuals. The memorandum establishes that on jobs bid after July 26, 1989, contractors were to be bound by new guidelines, based on common law rules, as to which owner-operators should be considered independent contractors and which should be considered employees. But there is nothing in the record to indicate that any new guidelines were ever established. We can only conclude that the memorandum failed to effect any modification of the way in which the employment status of owner-operators was to be determined, and that even on jobs bid after July 26, 1989, contractors remained bound by the language of Articles 8 and 25 of the 1989–92 CBA.

It is clear, then, that under Article 25, ¶¶ 1, 2 and 5 of the CBAs, Double M was required to treat as employees any of its owner-operators who owned and operated single trucks and who were not used as subcontractors pursuant to Article 8, throughout the period covered by the 1986–89 and 1989–92 CBAs. In consequence, the company was under a contractual obligation, under Article 11 of the CBAs and its Participation Agreement with the Fund, to make contributions to the Fund based on the hours worked by each of those owner-operators.

## B. Legality of Contributions

■ We turn now to Mrowicki's main argument, which is that (i) Double M could not

legally be required to make contributions to the Fund for its owner-operators unless those individuals were employees, rather than independent contractors, under the LMRA and ERISA, (ii) under those statutes, employee status is determined by reference to the common law, right-to-control test, and (iii) proper application of the right-to-control test shows that the company's owner-operators were, in fact, independent contractors, not common law employees.

■ Section 302(a)(1) of the LMRA prohibits payments by employers to "any representative of any of his employees …" 29 U.S.C. § 186(a)(1). Section 302(c)(5) provides an exception for certain payments to trust funds created by such representatives "for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)…." 29 U.S.C. § 186(c)(5). These provisions prohibit payments by employers to employee trust funds on behalf of, or for the benefit of, anyone ineligible to receive benefits from those funds. *Walsh v. Schlecht,* 429 U.S. 401, 407, 97 S.Ct. 679, 684, 50 L.Ed.2d 641 (1977); *Todd v. Benal Concrete Construction Co., Inc.,* 710 F.2d 581, 583 (9th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *See also, Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Savings Plan Trust Funds v. Karr Brothers, Inc.,* 755 F.2d 1285, 1289–90 (7th Cir.1985). The LMRA excludes any person having the status of independent contractor from the statutory definition of "employee," 29 U.S.C. §§ 142(3) and 152(3), and common law agency principals are used to distinguish between employees and independent contractors under the Act. *Darden,* —— U.S. at ——, 112 S.Ct. at 1349; *NLRB v. United Insurance Company of America,* 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). Thus, Mrowicki argues, it would have been illegal under § 302 of the LMRA for Double M to make contributions to the Fund pursuant to Articles 11 and 25 of the CBAs based on

work performed by any of its owner-operators who were not common law employees under the right-to-control test enunciated in *Darden,* — U.S. at — – —, 112 S.Ct. at 1348–49.

Mrowicki is mistaken. In *Walsh v. Schlecht,* 429 U.S. 401, 97 S.Ct. 679, the Supreme Court held that a clause in a collective bargaining agreement making an employer liable for payment of trust fund contributions based on the hours worked at a job site by individuals other than its own employees did not violate § 302 of the LMRA. *Id.* at 407–10, 97 S.Ct. at 684–86. The agreement required the employer to be liable for payment of a subcontractor's employees' trust fund contributions "in accordance with this Agreement." *Id.* at 405, 97 S.Ct. at 683. The Court observed that if the clause was interpreted to bind the employer to make contributions to the trust fund *"on behalf of"* or *"for the benefit of"* the subcontractor's employees, so that they could participate in the benefits provided by the funds, it would violate § 302(a)(1) because the subcontractor was not a signatory to the collective bargaining agreement, and his employees were therefore ineligible for trust fund benefits based on work performed for him. *Id.* at 407, 97 S.Ct. at 684. If, on the other hand, the clause was interpreted merely as obligating the employer to pay contributions to the funds *measured by* the hours worked by the subcontractor's employees, the benefits being payable only to the employees of the employer and other signatory contractors, it would be authorized under § 302. *Id.* The Court affirmed enforcement of the provision. *Id.* at 410–11, 97 S.Ct. at 686.

We agree with Mrowicki that if Article 11 of the CBAs had required Double M to make contributions to the Fund *"on behalf of"* or *"for the benefit of"* individuals who were ineligible to receive benefits from the Fund, those contributions would have been prohibited under § 302 of the LMRA. *Walsh v. Schlecht,* 429 U.S. at 407, 97 S.Ct. at 684. As such, they would have been unenforceable under § 515 of ERISA, 29 U.S.C. § 1145. *Gerber,* 870 F.2d at 1153. However, Article 11 only required contributions *"for each hour worked by each employee covered by this Agreement."* It established that contributions were to be *measured by the hours worked* by individuals classified as employees under the terms of the CBAs (who included, as discussed above, those owner-operators who were to be treated as employees under Article 25); it did not specify that the payments were to be made *"on behalf of"* or *"for the benefit of"* every individual whose hours of work formed the basis of the payments. Thus, even if Articles 11 and 25, when read together, required Double M to make contributions to the Fund based on the numbers of hours worked by individuals who, as Mrowicki claims, were not employees of the company under the common law definition, and who would be ineligible to receive benefits from the Fund, those contributions would not have violated § 302. *Walsh v. Schlecht,* 429 U.S. at 407, 410–11, 97 S.Ct. at 684, 686. *See also, Brogan v. Swanson Painting Co.,* 682 F.2d 807, 809 (9th Cir.1982) (approving an agreement similar to that in *Walsh v. Schlecht* ); *Chicago Painters,* 755 F.2d at 1289–90 (where an employer violated collective bargaining agreements by engaging independent contractors, the district court's award of relief in the form of contributions to a trust fund in the amount that the employer would have been required to contribute to the funds if it had hired employees did not violate § 302). We therefore reject Mrowicki's contention that the extent of its obligation to make contributions to the Fund under the CBAs and § 302 can be determined only upon resolution, by application of the common law right-to-control test, of the common law employment status of its owner-operators.

Mrowicki places great reliance on the Ninth Circuit's decision in *Todd v. Benal Concrete Construction Co., Inc.,* 710 F.2d 581, (9th Cir.1983), in which the court held that under § 302 of the LMRA, an employer could not be required to make trust fund contributions for individuals who were found, on application of the common law test, to be independent contractors. But *Todd* is entirely consistent with the result we reach here, because in that case, the Ninth Circuit determined that under the collective bargaining agreement at issue, the employer would have been required to make trust contribu-

tions *on behalf of* independent contractors. *Id.* at 582, 584. Here, as we have made clear, Double M was required only to make contributions *measured by the hours worked* by the individuals it claims were independent contractors.

In its original, August 26, 1992 decision, the district court granted summary judgment to the Fund based on its finding that under Article 25, ¶¶ 1 and 2 of the CBAs, Double M's owner-operators were to be treated by the company as employees. Its November 10, 1992 order was issued "to conform with the [Supreme Court's] recent decision in *Nationwide Mutual Ins. Co. v. Darden,* [—— U.S. ——], 112 S.Ct. 1344." Mrowicki appears to argue on appeal, as he evidently did to the district court, that because *Darden* adopted a common law test for determining who qualifies as an employee under ERISA, the common law test must be applied to ascertain Double M's obligation under Article 11 of the CBAs to make contributions to the Fund. *Darden* imposes no such requirement. At issue in *Darden* was the question of whether the respondent had standing under 29 U.S.C. § 1132(a), which enables an employee or former employee who is or may become eligible to receive benefits from an employee benefit plan, to enforce the substantive provisions of ERISA. *Darden,* —— U.S. at ——, 112 S.Ct. at 1347. The Court simply held that ERISA's nominal definition of the term "employee" as "any individual employed by an employer," 29 U.S.C. § 1002(6), requires traditional common law agency law principles to be used in determining who qualifies as an "employee" under the Act's statutory provisions. *Id.* at ——, 112 S.Ct. at 1348. There is nothing in *Darden* to prevent enforcement by the Fund of Double M's *contractual* obligation under Article 11 of the CBAs to make payments to the Fund measured by the hours worked by *all* of the individuals that the company was required to treat as employees under the provisions of the agreements—regardless of the employment status of those individuals under the common law.

## C. Actions of the Fund's Trustees

The actions of three of the Fund's trustees, Gerald Reilly, Charles Gau-

witz and Beryle Redding, complicate, but ultimately do not affect, our analysis. As Mrowicki acknowledges, the Fund is like a holder in due course in commercial law, and is entitled to enforce the written terms of the CBAs without regard to understandings or defenses applicable to the subscribing parties. *Gerber,* 870 F.2d at 1149; *Robbins v. Lynch,* 836 F.2d 330, 333 (7th Cir.1988). Mrowicki contends, however, that all or part of Double M's obligation to contribute on the basis of hours worked by its owner-operators was excused by the representations and actions of Reilly, Gauwitz and Redding. Reilly, he claims, made statements that led him to understand that the labor agreement would not require contributions for owner-operators generally, but that he should make payments on behalf of three—Russell Schmidt, Roger Bacidore and Dan Hook—because they were sick or nearing retirement. Gauwitz and Redding signed the 1989 Memorandum of Understanding which, Mrowicki maintains, relieved Double M of any obligation to contribute to the Fund for hours worked by owner-operators on jobs bid before July 26, 1989. They were also present at the January 10, 1990 meeting of the JGC at which Mrowicki claims he was told that Double M would not be expected to make contributions to the Fund on the basis of such work, and, Mrowicki maintains, they failed to object to that proposition. The Fund, Mrowicki contends, had knowledge of the Memorandum of Understanding and of the representations made to him on January 10, 1990, imputed through Gauwitz and Redding. Further, he asserts, there is at least an issue of fact to be resolved as to whether Reilly, Gauwitz and Redding had apparent authority to act on behalf of the Fund when, by their statements and actions, they led him to believe that Double M had no obligation to make payments to the Fund for its owner-operators on jobs bid before July 26, 1989.

This court reviewed the authority of employee benefit plan trustees in *Mason & Dixon Lines, Inc. v. Glover,* 975 F.2d 1298 (7th Cir.1992). Under ERISA, a trust agreement providing for more than one fiduciary must provide for joint authority to control and manage the operation and administration

of the plan. *Id.* at 1303 (citing 29 U.S.C. § 1102(a)(1)). Where a fund's assets are held by two or more trustees, ERISA provides that the trustees " 'shall jointly manage and control the assets of the plan ...' " *Id.* (quoting 29 U.S.C. § 1105(b)(1)(B)). The common law of trusts defines the scope of authority and responsibility of plan trustees, and under trust law the exercise of joint powers requires the action of all trustees. *Id.* The trustees may delegate authority to an agent to perform certain acts. *Id.* In addition, an agent may bind his principal through the exercise of apparent authority, which " 'arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf.' " *Id.* (quoting *Bank of North Carolina, N.A. v. Rock Island Bank,* 630 F.2d 1243, 1251 (7th Cir.1980)). "Where the principal places an agent in a situation where the agent may be presumed to have authority to act, his principal is estopped against a third party from denying the agent's apparent authority." *Id.* (citing *Rock Island Bank,* 630 F.2d at 1251). In determining whether apparent authority exists, "courts focus on the acts of the principal." *Id.* (citing *Rock Island Bank,* 630 F.2d at 1251; *State Security Insurance Co. v. Burgos,* 145 Ill.2d 423, 164 Ill.Dec. 631, 635, 583 N.E.2d 547, 551 (1991)).

With regard to Mrowicki's allegations concerning Gerald Reilly, there is nothing in the record to establish when it was that Reilly made the statements upon which Mrowicki allegedly relied. It is undisputed that Reilly did not become a Fund trustee until March 1989. Such oral representations as he may have made to Mrowicki before that time, even in his capacity as President and Business Agent of Local 722, could not have affected Double M's obligation to contribute to the Fund. *Gerber,* 870 F.2d at 1149, 1151–56. And there is no evidence in the record to indicate that he told Mrowicki at any time *after* March 1989, in his capacity as a trustee of the Fund or otherwise, that Double M might be excused from its obligation to make payments for the time worked by its owner-operators.[15] We need not, therefore, inquire further into whether or not he had actual or apparent authority to act on behalf of the Fund.

Equally, we find nothing in the actions of Charles Gauwitz and Beryle Redding to relieve Double M of any part of its obligation to make payments to the Fund under the provisions of the CBAs. Gauwitz and Redding did, indeed, sign the 1989 Memorandum of Understanding. But that document did not purport to absolve contractors from liability for Fund contributions based on the work performed by owner-operators. Under the terms of the memorandum, the Illinois Conference of Teamsters agreed that the Associated General Contractors of Illinois and all signatory contractors would be provided with written assurances waiving the right of the Conference and the local unions to institute legal action under the subcontractor (Article 8) and owner-driver (Articles 25 and 26) provisions of the CBA pertaining to owner-operators "for all past (completed) work." The parties agreed further that on all work bid after July 26, 1989, contractors would be bound by the subcontractor and owner-driver clauses pursuant to new guidelines concerning the employment status of owner-operators. But nowhere in the document is there any suggestion that contractors might be relieved of their obligations to the Fund under Article 11 of the CBAs with respect to work bid prior to July 26, 1989, as Mrowicki contends, or that the Fund would refrain from instituting actions to recover delinquent contributions. Again, therefore, we need not decide whether Gauwitz and Redding had actual or apparent authority to act for the Fund in signing the memorandum.[16]

15. To the contrary, the record demonstrates that it was in March, 1989, at about the same time as he became a Fund trustee, that Reilly filed Local 722's grievance with the JGC complaining that Double M had violated the CBA by failing to pay proper contributions for its employees, *"including owner/drivers."* And it was Reilly who argued Local 722's case at the January 10, 1990 meeting of the JGC.

16. Similarly, since we have found, *supra,* that the memorandum failed to effect any modification of the way in which the employment status of owner-operators was to be determined for purposes of the 1989–92 CBA, we need not decide either whether knowledge of the provisions of the memorandum should be imputed to the Fund through

Finally, we cannot agree with Mrowicki that Double M should be excused from a portion of its obligations by the failure of Gauwitz and Redding to object when Mrowicki was told, at the January 10, 1990 meeting of the JGC, that Double M would not be expected to make contributions to the Fund on the basis of work performed by its owner-operators on jobs bid before July 26, 1989.[17] Mrowicki's argument seems to be that simply because Gauwitz and Redding were Fund trustees, they appeared to have authority to act for the Fund at the meeting; thus, the Fund should be estopped from denying that they had authority to act on its behalf, and it must therefore be held to whatever Mrowicki may have been told regarding Double M's liability for owner-operator contributions.

Mrowicki has failed to produce any evidence at all that Gauwitz and Redding actually agreed at the January 10, 1990 JGC meeting that Double M should be excused from any of its obligations to the Fund, or that they indicated to him that the Fund would be bound by any such agreement. But the fatal flaw in his argument is that he makes no claim that Gauwitz or Redding represented to him either that they were attending the meeting in their capacities as Fund trustees, or that they had authority to act on behalf of the Fund to absolve Double M from its obligations. As a signatory to the 1989–92 CBA, Mrowicki must have known that Gauwitz and Redding were at the JGC meeting as union representatives pursuant to Article 20 of the CBA, not as representatives of the Fund. The JGC's function under Article 20 was to settle disputes between employers and local unions. The CBA did not provide the Fund with formal representation on the committee. In the absence of any claim that Gauwitz or Redding suggested to Mrowicki that they were empowered, as Fund trustees, to excuse all or part of Double M's liability for contributions based on the hours worked by its owner-operators, Mrowicki cannot persuade us that they had apparent authority to act on behalf of the Fund at the

January 10, 1990 JGC meeting. Courts focus on the acts of the principal when they determine whether an agent has apparent authority to act for the principal. *Mason & Dixon Lines, Inc. v. Glover,* 975 F.2d at 1303. There is nothing in this case to suggest that the Fund, through the behavior of Gauwitz and Redding or otherwise, acted in any way to lead Mrowicki to believe that its trustees had authority to act on its behalf at the January 10, 1990 meeting.

### III. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

Gauwitz and Redding, or whether, in any event, the Fund could be bound by any modification.

17. We assume, *arguendo,* that Mrowicki was indeed informed at the meeting that he need not

make contributions for owner-drivers based on jobs bid prior to July 26, 1989, that Gauwitz and Redding were aware of what he had been told, and that they did indeed fail to object.