United States Court of Appeals
For the First Circuit


No. 97-2402 

LABOR RELATIONS DIVISION OF CONSTRUCTION
INDUSTRIES OF MASSACHUSETTS, INC., ET AL.,

Plaintiffs, Appellees,

v.

TEAMSTERS LOCAL 379,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]



Before

Torruella, Chief Judge,

Coffin and Bownes, Senior Circuit Judges.



Paul F. Kelley, with whom Anne R. Sills and Segal, Roitman &
Coleman were on brief, for appellant.
John D. O'Reilly III, with whom O'Reilly & Grosso, P.C. was on
brief, for appellees.



August 17, 1998
TORRUELLA, Chief Judge. Plaintiff, Teamsters Local 379
("Teamsters" or the "Union"), filed grievances against eight Boston
Harbor Project employers on behalf of certain truck drivers on the
project who own and drive their own trucks (the "owner-operators")
and are engaged in the transportation and removal of fill from the
construction site. The Teamsters argued that those drivers were
entitled to receive the various fringe benefit payments received by
project employees. The subject of the present dispute is whether
the owner-operators qualify as "independent contractors" or as
"employees" under the Labor Management Relations Act (LMRA), 29
U.S.C. 141, et seq. The arbitrator assigned to this case
concluded that the owner-operators are "employees," and thus
entitled to receive the benefit payments. The district court
reversed this finding, ruling that the owner-operators are
"independent contractors," and that any payment of benefits would
violate section 302 of the LMRA, 29 U.S.C. 186. After careful
review, we affirm the district court.
BACKGROUND
Underlying the grievances in this case is the Harbor
Project Labor Agreement (the "Project Agreement"), entered into by
the Union and various contractors (or "project managers") engaged
in the construction of waste water treatment facilities on Deer
Island in the Boston Harbor (the "Boston Harbor Project"). After
years of using private owner-operators for hauling their
construction materials, wastes, and fills on the construction site
without making any fringe benefit contributions on their behalf,
project managers received complaints from the Union on March 2,
1992, for allegedly violating the Project Agreement. In 1994, this
court decided Labor Relations Div. of Constr. Ind. of Mass. v.
Teamsters Local 379, 29 F.3d 742 (1st Cir. 1994) ("Teamsters I"),
which stemmed from those grievances. In Teamsters I, we affirmed
an arbitrator's finding that the Project Agreement must be read to
incorporate certain provisions of the earlier Massachusetts
Teamsters' Heavy Construction Agreement ("Teamsters' Agreement")
which obligates employers to make health insurance and pension
contributions on behalf of the owner-operators.
However, we remanded the case to the arbitrator to
determine whether the owner-operators would be considered
"independent contractors" or "employees" under the LMRA. If the
owner-operators fall into the "independent contractors" category,
certain fringe benefit payments on their behalf would violate the
LMRA, 29 U.S.C. 186, which prohibits such payments to labor
unions unless the payments are made to trust funds "for the sole
and exclusive benefit of the employees of such employer." 29
U.S.C. 186 (c)(5) (emphasis added). Thus, unless the owner-
operators are considered "employees," the Project Agreement is
unenforceable insofar as it requires illegal benefit payments to be
made to a labor union. If the project managers were to make
contributions for the benefit of independent contractors, they, and
the Union, could be subject to federal criminal prosecution.
On remand, the arbitrator assigned to the case concluded
that the owner-operators are employees, and not independent
contractors. After a thorough review of case law and agency
doctrine, the arbitrator applied a multi-factored test which
incorporated common law agency principles and a so-called "economic
realities" test (which focused on the financial independence of the
workers) in order to determine that the truck owner-operators are
significantly similar to other employees on the Boston Harbor
Project. This finding was appealed to the district court.
Because an interpretation of a federal criminal statute
was involved, the magistrate and district court thoroughly reviewed
the arbitrator's findings. See Teamsters I, 29 F.3d at 747-48;
Washington Post v. Washington-Baltimore Newspaper Guild, Local 35,
787 F.2d 604, 606 (D.C. Cir. 1986). Ultimately, the district
court, adopting a lengthy and equally thorough report and
recommendation from the magistrate, reversed the arbitrator. The
magistrate reported that the arbitrator had seen fit to "disregard
uncontradicted evidence and controlling principles of law to reach
a result that accorded with his own notions of industrial justice." 
Now, once again, this case has been appealed to our court.
ANALYSIS
I. Preliminary Arguments
Before we proceed, we must address two separate arguments
put forward by the Union as to why this proceeding is unnecessary. 
According to both of these arguments, the project managers are
required to make the benefit payments at issue even if an
application of the common law of agency shows that the owner-
operators are independent contractors. Neither argument has merit.
The Union's first argument is premised upon LMRA section
302(c)(2), which explicitly exempts any payments made in
satisfaction of an arbitrator's award from section 302(a)'s general
prohibition on employers' payments to labor organizations. See 29
U.S.C. 186(a) & (c)(2). The union claims that the employers in
this case would, therefore, not be subject to prosecution under the
LMRA since any payments that the project managers would make on
behalf of the owner-operators would be made pursuant to the
arbitrator's interpretation of the Project Agreement. The Union
believes that the concern we expressed in Teamsters I that
enforcement of the Project Agreement could subject the employers to
federal prosecution, see 29 F.3d at 748, was unwarranted and our
remand unnecessary.
The Union, however, fails to take into account the entire
text of LMRA section 302(c)(2), which exempts employers' payments
to labor organizations from section 302(a) only where those
payments are made in satisfaction of an arbitrator's award "in
compromise, adjustment, settlement, or release of any claim,
complaint, grievance, or dispute . . . ." 29 U.S.C. 186(c)(2). 
The arbitrator's decision affirmed in Teamsters I interpreted the
Project Agreement as requiring, by its own terms, that project
managers make benefit payments on behalf of the owner-operators. 
Thus, project managers were required by their contract to make the
benefit payments on behalf of the owner-operators before the
arbitrator ever read the Project Agreement, and are not required to
make payments in satisfaction of any settlement, or for release of
any claim. LMRA section 302(c)(2) is therefore irrelevant.
Under the Union's flawed interpretation of the LMRA, any
employer and union wishing to circumvent section 302's prohibition
on direct payments to labor organizations could simply contract to
do so in plain terms, and then engage an arbitrator to interpret
that contract. We decline to read such an enormous loophole into
the statute against its plain language. 
The Union's other argument that purportedly moots this
appeal is no more useful. According to the Teamsters, the
employers may be obligated to contribute to benefit funds for hours
worked by subcontractors even when those same subcontractors are
legally ineligible to receive those funds, which are "for the sole
and exclusive benefit of the employees . . . ." 29 U.S.C.
186(c)(5). This argument follows from the Supreme Court's logic
in Walsh v. Schlecht, 429 U.S. 401, 407-410 (1977), which held that
if an employer is contractually bound to make trust fund
contributions based on the hours worked at a job site by
individuals other than its own employees, then, so long as the
individuals cannot enjoy those benefits, the employer does not
violate section 302 of the LMRA when it performs its obligation. 
See also Illinois Conference of Teamsters and Employers Welfare
Fund v. Mrowicki, 44 F.3d 451, 461 (7th Cir. 1994) (extending Walshto health and welfare benefit contributions). Those funds would
then be held in trust by the Union. The Teamsters note that the
Project Agreement only requires contributions for owner-operators
based upon their hours worked, and argues that the grievance
underlying this case was primarily concerned with whether the
project managers were required to make the contributions, not
whether owner-operators were eligible to receive benefits. Thus,
according to the Union, this case is governed by Walsh and
Mrowicki, and our remand in Teamsters I was unnecessary.
Unfortunately for the Union, this argument comes too
late. In Teamsters I, we noted that "[n]either party disputes that
the plaintiffs' payment of fringe benefits on behalf of the owner-
operators [would be] illegal under Section 302 if the owner-
operators are independent contractors rather than employees." Id.at 748. We based this conclusion on the Union's previous filings,
wherein the Teamsters had demanded "that all Health and Welfare
contributions and all Pension contributions be made on behalf of
all truck drivers" while acknowledging that it did "not dispute the
proposition that Section 302 prohibits fringe benefit contributions
on behalf of independent contractors." The Union claimed that its
grievance was filed on behalf of "certain truck drivers who were
not receiving fringe benefits" even though "the owner-operators
were entitled to fringe benefit coverage." In Teamsters I, the
Union presented only one argument on the LMRA section 302 issue in
this case, i.e., that the arbitrator correctly, if implicitly,
found that the owner-operators were employees. We determined that
this argument could only be properly resolved after remand. See 29
F.3d at 748-49.
Tardily, the Union tries to reverse course, after remand,
by arguing that it is entitled to trust fund contributions based
upon hours worked by owner-operators, even if they are found to be
independent contractors ineligible to benefit from those trust
funds. The arbitrator, when first presented with this case, could
have determined whether the Teamsters Agreement required fringe
benefit contributions based upon the hours worked by independent
contractors. He did not make such a finding because he was not
asked to do so. Had the Union made this argument at any time prior
to the remand in Teamsters I, we might have considered asking the
arbitrator to address this issue. However, the introduction of the
issue at this late date would require another remand, and we are
unwilling to further delay this already ancient dispute. 
When a party could have raised an argument in his initial
appeal, and failed to do so, he has generally waived his right to
raise that argument on remand or on appeal from remand. See United
States v. Adesida, 129 F.3d 846, 849-50 (6th Cir. 1997); Harmon v.
Thornburgh, 878 F.2d 484, 496 (D.C. Cir. 1989); Omni Outdoor
Adver., Inc. v. Columbia Outdoor Adver., Inc., 974 F.2d 502, 506
(4th Cir. 1992). This case is no exception. An examination of the
Teamsters' Agreement reveals that the Union's interpretation,
although not unreasonable, is not "so compelling as to virtually
insure appellant's success." Credit Francais International, S.A.v. Bio-Vita, Ltd., 78 F.3d 698, 709 (1st Cir. 1996) (raise-or-waive
rule will only be ignored where the new argument is "so compelling
as virtually to insure appellant's success, and a gross miscarriage
of justice would result from the failure to address it.")
(citations omitted). Moreover, Walsh had been decided long before
the grievance underlying this case was ever filed, and the Union
has failed to provide any explanation of its failure to raise this
argument earlier. Cf. Old Ben Coal Co. v. Director, Off. of
Workers' Compensation Programs, U.S. Dept. of Labor, 62 F.3d 1003,
1007 (7th Cir. 1995) (presumption of waiver for arguments first
raised on remand can be overcome where those arguments are based
upon important intervening case law which could not have been
considered during initial appeal). We must deem the argument
waived.
II. Standard of Review
In Teamsters I, we held that:
[T]he issue of whether fringe benefit
contributions on behalf of the owner-operators
is illegal under federal law does not involve
the same type of circumscribed judicial review
that we afford arbitration decisions grounded
in interpretations of a contract. Although
the arbitrator's factual findings regarding
the status of the owner-operators under
Section 302 of the LMRA, 29 U.S.C. 186, may
deserve a certain amount of deference, the
issue of illegality is ultimately one for
federal court review. Given that a
determination under 302 could have criminal
consequences, the plaintiffs deserve a
thorough judicial review of an arbitrator's
decision as to this issue. . . . We are not
prepared, however, to conduct that analysis
ourselves without first giving the arbitrator
the opportunity to reexamine the factual
circumstances of this case. . . . [T]he
arbitrator can play an important role in
providing first-hand factual findings for the
benefit of the reviewing court.
29 F.3d at 747-49 (citations omitted).
Despite this seemingly clear review of the
responsibilities of the arbitrator and reviewing district court on
remand, the parties, and indeed the arbitrator himself, have since
expressed confusion regarding the deference to which the arbitrator
was entitled on his determination of the owner-operator status. We
thus revisit the issue, with an eye towards further clarifying the
roles that an arbitrator and reviewing court play when applying a
statute to a body of facts.
"It is by now a familiar rule that an arbitrator's award
is entitled to significant deference." Washington Post, 787 F.2d
at 606. In fact, where the parties have previously bargained for
the benefit of an arbitrator's expertise in settling any
contractual disputes, the courts have "no business weighing the
merits of the grievance, considering whether there is equity in a
particular claim, or determining whether there is particular
language in the written instrument which will support the claim." 
United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 567-
68 (1960). Therefore, courts hearing appeals from arbitration
awards interpreting contracts must tread much more gingerly than
appellate courts reviewing district court decisions. See United
Paperworkers Int'l. Union v. Misco, Inc., 484 U.S. 29, 37-38
(1987).
"Despite this rule, it is unquestionably the province of
the courts to say what the law is. We need not defer to an award
which contemplates a violation of law." Washington Post, 787 F.2d
at 606. When an arbitrator's interpretation of a contract
potentially exposes a party to federal prosecution, the courts
become more active. The law is our charge, and our responsibility
to interpret it cannot be abdicated. Insofar as and only insofar
as an arbitrator's findings and conclusions will determine the
reach of a federal criminal statute into a dispute with which he is
involved, his findings of fact will be reviewed for clear error and
his legal conclusions de novo. See id.; International Brotherhood
of Electrical Workers, Local 97 v. Niagara Mohawk Power Corp., 143
F.3d 704, 726 (2d Cir. 1998). This doctrine flows, in part, from
the observation that private parties must not be empowered to
contract out of a thorough judicial review of their potentially
criminal activities. Cf. Misco, 484 U.S. at 42 (observing that
"the public's interests in confining the scope of private
agreements to which it is not a party will go unrepresented unless
the judiciary takes account of those interests . . . "). The
doctrine also reflects the interest of private parties in not being
compelled to engage in conduct that might subject them to criminal
prosecution. This provides for a limited "public policy" exception
to the standard of review normally applied to an arbitrator's
decisions whereby "as long as the arbitrator is even arguably
construing or applying the contract and acting within the scope of
his authority, that a court is convinced he committed serious error
does not suffice to overturn his decision." Id. at 371, quoted inS.D. Warren Co. v. United Paperworkers' Intern'l Union, Local 1069,
845 F.2d 3, 7 (1st Cir. 1988).
It was against this backdrop that we declared ourselves
"too far removed from the dispute" to make the necessary "first-
hand factual findings" necessary to properly resolve this case four
years ago. Teamsters I, 29 F.3d at 749. Now, on review, we afford
those first-hand factual findings great deference, with far less
deference to those findings which are based only upon the
arbitrator's analysis and synthesis of the existing record, and no
deference for the arbitrator's purely legal application of federal
law to those facts. Again, let us be clear about the unusual
circumstances of this case which empower us to review this
arbitrator's findings so thoroughly. We are not determining
anyone's rights under contract in this appeal, but instead whether
adherence to the Project Agreement, as interpreted by the
arbitrator, requires criminal conduct. Under these circumstances,
we would be derelict in our duties if we were to afford the
arbitrator greater deference than this.
The arbitrator's decision reveals that he took the time
and effort required to thoroughly review caselaw and to assemble a
detailed list of relevant factors to consider in determining
whether the owner-operators are employees or independent
contractors. The decision also reveals that the arbitrator relied
very little upon his first-hand observations in making his
decision. As the magistrate judge observed, despite the fact that
the arbitrator visited the construction site in 1995, he makes no
explicit reference to his personal observations in his 28-page
decision. While we acknowledge that the fact-finder's personal
observations may have implicitly influenced certain factual
conclusions, reading the arbitrator's decision informs us that the
bulk of his findings were premised solely upon his synthesis and
analysis of the record in comparison with other relevant Circuit
and Supreme Court cases. Thus, most of the arbitrator's opinion
stems from an interpretation of the common law, which, though
carefully constructed and somewhat helpful, is not entitled to much
deference from this court under the circumstances of this case.
III. Common Law Agency Analysis
In order to determine whether the owner-operators are
employees of the project managers under the LMRA, we must look to
general principles of the common law of agency. See Teamsters I,
29 F.3d at 748. Applying the common law to determine whether
owner-operator truck drivers are employees or independent
contractors is nothing new to this or other federal appellate
courts. See United States v. Silk, 331 U.S. 704 (1947); NLRB v.
Amber Delivery Service, Inc., 651 F.2d 57, 63-64 (1st Cir. 1981);
Berger Transfer & Storage v. Central States, Southeast and
Southwest Areas Pension Fund, 85 F.3d 1374, 1379 (8th Cir. 1996);
C.C. Eastern, Inc. v. NLRB, 60 F.3d 855, 860-61 (D.C. Cir. 1995);
North American Van Lines, Inc. v. NLRB, 869 F.2d 596, 604 (D.C.
Cir. 1989); NLRB v. A. Duie Pyle, Inc., 606 F.2d 379, 387-88 (3d
Cir. 1979); Merchants Home Delivery Service, Inc. v. NLRB, 580 F.2d
966, 975-76 (9th Cir. 1978); Associated Gen. Contractors of Cal.,
Inc. v. NLRB, 564 F.2d 271, 280 (9th Cir. 1977). In doing so, the
fundamental inquiry is whether the employer has the "right to
control the manner and means by which the product is accomplished." 
Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992). This
is the so-called "right to control" test. In applying this multi-
factored test, "all of the incidents of the relationship must be
assessed and weighed with no one factor being decisive." Id. at
324 (quoting NLRB v. United Ins. Co. of Am., 390 U.S. 254, 258
(1968)); Teamsters I, 29 F.3d at 748.
While no one factor is decisive in this determination,
there can be little doubt of the prominence of the factor of
entrepreneurial risk and reward, i.e., "'Employees' work for wages
or salary . . .[while] 'Independent Contractors' . . . depend for
their income . . . upon the difference between what they pay for
goods, materials, and labor and what they receive for the end
result, that is, . . . profits." H.R. Rep. No. 245, 80th Cong.,
1st Sess. 18 (1947), reprinted in 1 Legislative History of the
Labor Management Relations Act, 1947, at 309 (1948); see also C.C.
Eastern, 60 F.3d at 858-61; A. Duie Pyle, 606 F.2d at 382. This
important factor clearly militates in favor of a finding of
"independent contractor" status in this case. The owner-operators
here bear the costs of owning and insuring their own trucks, and
cover fuel, repair, and tax expenses stemming from the operation of
those vehicles. Both the arbitrator and the district court
acknowledge that this factor favors the position of the project
managers.
The arbitrator, however, reasoned that the degree of
control that the project managers exercised over the manner in
which the owner-operators performed their work was so great as to
overcome the entrepreneurial risk and reward factor. It is true
that this court has determined that the degree of control exercised
over owner-operators may be so complete as to support a
determination that an employer-employee relationship has been
created despite the fact that the owner-operators own their own
equipment, pay their own expenses, and purchase their own
insurance. See Amber Delivery Service, 651 F.2d at 63-64. 
However, we must agree with the district court's conclusion that
this is not such a case. Upon examination, the arbitrator's
erroneous conclusions can be traced to a misunderstanding of the
"right to control" test, unsupported findings of fact, and a
failure to appreciate the significance of further key evidence of
an independent contractor relationship. 
An employer will always control the result to be achieved
on a given project, whether an employer-employee or independent
contractor relationship exists. The difference in agency status,
then, lies in whether the manager controls the means of obtaining
that result. See C.C. Eastern, 60 F.3d at 858. With this
background, we conclude that the arbitrator erred when he relied
upon the fact that the project managers control where, when, and
how often loads are necessary for transport in order to support a
finding of an employee-employer relationship. Such would be the
case regardless of the employment relationship of the drivers and
the managers.
Other similar errors appear in the arbitrator's decision. 
For example, the arbitrator regarded the following factors as
important evidence of an employer-employee relationship: (1) that
employers may terminate or shorten the work day due to lack of
work; (2) that they require truck loading and off-loading to
conform to barge availability; and (3) that the owner-operators
have become economically dependent upon the Boston Harbor project. 
However, these factors do not cut either way. They pertain to the
amount and type of work at issue, and not to the degree of control
exercised over the means by which that work is accomplished.
When the arbitrator examined relevant factors to the
"right to control" test, he reached conclusions which were entirely
unsupported by the testimony in this case. For example, he
concluded that employers determined the drivers' routes of travel
on Deer Island and subjected owner-operators to constant on-site
supervision. The transcript, however, clearly reveals that the
Massachusetts Water Resources Authority, a public authority,
determined routes of travel, and, furthermore, there was simply no
evidence to support the arbitrator's conclusion that owner-
operators were subject to constant supervision.
The arbitrator also failed to recognize the significance
of certain evidence supporting independent contractor status. 
Uncontradicted evidence revealed that owner-operators often perform
their services for more than one company during the course of a
day, sometimes send friends or relatives to drive their trucks in
their place, schedule their own rest breaks, and perform their
services on whatever days they choose. The arbitrator declined to
factor this evidence into his analysis. However, this evidence is
highly probative of the agency status in the case, and helps to
easily distinguish owner-operators from employees. See Darden, 503
U.S. at 323-24 ("the extent of the hiring party's discretion over
when and how long to work" and "the hired party's role in hiring
and paying assistants" factor into the common law right of control
test); C.C. Eastern, 60 F.3d at 860 (whether and how often owner-
operators drive for other companies is important to a determination
of agency status).
To successfully counter the evidence that the Boston
Harbor owner-operators assume entrepreneurial risk and reward while
working for numerous different employers each week, the Union would
have had to present compelling evidence that owner-operators are
subject to a high degree of management control over the means by
which they accomplish their job. The Union was clearly unable to
meet that burden.
Both parties agree that in NLRB v. Amber Delivery
Service, Inc., 651 F.2d 57 (1st Cir. 1981), this court set out a
proper analysis of agency status disputes involving owner-operator
truck drivers. A comparison between the facts of these two cases
further illustrates why the Teamsters' present position is
untenable.
In Amber, we expressed doubts about whether the NLRB
correctly determined that the owner-operators in that case were
employees. See 651 F.2d at 64 n.8. However, pursuant to the
deferential standard of review applicable to that case, we
determined that there was insufficient evidence to compel reversal
of the Board. Id. Almost none of the factors which made Ambersuch a close case appear in the present dispute. In Amber, the
owner-operator delivery truck drivers were required to report to
work by 8:00 a.m. with their vehicles loaded, were required to
phone the employer every two hours during the day, were not allowed
to reject loads, were prohibited from providing similar services to
other employers, were required to attend training and safety
meetings and were required to wear company uniforms and paint their
vehicles with company colors affix company sign. See id. at 62-63
(explaining that these specific facts were important to the
resolution of that case). At the Boston Harbor Project, the owner-
operators can begin their work day at any time, occasionally reject
loads, provide similar services to other employers, are not
required to attend any meetings, and are not required to identify
with a given employer by wearing uniforms, painting their trucks or
using company signs. Ultimately, despite factors such as the
drivers receiving an hourly wage, which would tend to support a
finding of an employer-employee relationship, there is insufficient
evidence of management control over the manner in which owner-
operators work to support the arbitrator's opinion.
CONCLUSION
For the reasons stated herein, the judgment of the
district court is affirmed.